## JOSEPH ORR *v.* DAVID LACEY.

In assumpsit, by the first endorsee, against the endorser of a bill of exchange, *it was held*, that the acceptor, for whose accommodation the bill was drawn and endorsed, and who first negotiated it to the plaintiff, was a competent witness for the defendant, to prove facts which would render the bill void.

A corporation possesses only those powers conferred upon it by its charter.

The contract of a corporation, unauthorized by, or in violation of its charter, is void.* And so will be a new contract growing out of it, and not founded upon a new consideration.†

If, therefore, a bank, on discounting a bill of exchange, corruptly reserves greater interest than it is authorized by its charter to receive, the bill will be void. And so, also, will be a new bill given in renewal of the balance due on such previous illegal one.

Where the transaction, on its face imports the reservation of excessive interest, there is no room left for presumption : the intent is apparent. Where however, it is fair on its face, the law will not infer an intent, or a corrupt agreement, to take illegal interest, in violation of the charter ; but this must be clearly established. And the question of intent, is, in such cases, a question for the jury.

Our courts will not lend their aid to enforce a contract made with a corporation of another state, in violation of its charter.

MOTION, by the defendant, for a new trial, reserved from Berrien circuit court. The facts are fully stated in the opinion.

*J. S. Chipman,* in support of the motion.

*N. Bacon, and J. B. Niles,* contra.

WHIPPLE, J. delivered the opinion of the Court.

This was an action of assumpsit, upon the following bill of exchange, endorsed by the defendant, and accepted by Obed P. Lacey:

---

* See *Bank of Michigan* v. *Niles*, 1. Doug. Mich. R. 401. *Hurlbut* v. *Britain Ante.* 191. † See *Smith* v. *Barstow, Ante.* 155.

"$3,842.00.          Niles, Michigan, Sept. 21, 1840.

Six months after date, please pay to the order of *David Lacey*, at the City Bank, New York, three thousand, eight hundred and forty two dollars, and charge the same to the acc't of                    Your ob't. serv't.,

To *Obed P. Lacey, Esq.*               *Elijah Lacey.*"

It was admitted on the trial, that the action was brought for the benefit of the Branch of the Indiana State Bank, at Michigan City, the real holders of the bill.

After the evidence on the part of the plaintiff had been closed, the defendant offered Elijah Lacey, the drawer of the bill, as a witness: he was objected to by the plaintiff, as incompetent; but the objection was overruled, and he thereupon proceeded to testify, in substance, that the bill on which this action was brought, was drawn and endorsed for the accommodation of the acceptor, Obed P. Lacey, to be used for the renewal of the balance due on two other bills of the following tenor:

"$3,000.00.          Niles, Michigan, Feb. 1, 1840.

Five months after date, please pay to the order of *Wm. B. Beeson & Co.*, three thousand dollars at the Bank of America, New York City, and charge the same to the acc't. of                    Your ob't. serv't.,

To *Elijah Lacey, Esq.*               *O. P. Lacey.*"

The other bill was like the above, except that it was dated the 14th April, 1840, was for $2,000, and was payable ninety days after date. Both bills were endorsed by the payees, and accepted by Elijah Lacey. The witness further testified that they were accepted, and endorsed, for the sole benefit of Obed P. Lacey, for the purpose of enabling him, by procuring them to be discounted in the ordinary manner, to raise money to stock a mill which he was then carrying on.

The deposition of D. G. Collamer, was then read in evidence, by which it was shown that he was the cashier

of the Michigan City Branch of the State Bank of Indiana, on the days when these two bills respectively bear date ; and that the one bearing date the 1st February 1840, was negotiated by the said Branch Bank, by authority of the exchange committee : *that the consideration was Indiana Bank notes, less the regular rate of interest.*

Obed P. Lacey, was then introduced as a witness, (having been released by the defendant,) and was objected to by the plaintiff on the ground of incompetency : the objection was overruled by the court, and the witness was then sworn, and testified in substance, that the Michigan City Branch Bank negotiated for him the bill dated 1st February, 1840 ; that he received the sum of $3000, less the discount of 6 per cent. in the bills of various Branches of the State Bank of Indiana: that he afterwards negotiated the bill dated April 14, 1840, at the same Branch, and received therefor the like funds, after deducting six per cent.  The witness further stated that after the bills were protested, he gave to the Bank a draft of $1500, upon Eli Hart & Co., of New York, which was paid on the 15th Aug. 1840 : The *witness here* introduced a letter dated July 31st, 1840, from A. P. Andrews, cashier, to him, in which Andrews proposed, in behalf of the board of directors, that by his renewing the balance due on the bills, including exchange, after deducting the $1500, no damages would be charged on them.

Another letter from the cashier to the witness, was then produced, dated Sept. 10, 1840, as follows : " Yours of the 6th instant is received, and has been laid before the board.  They have authorized me to say to you that the time you ask (6 months) will be extended to you, by your giving your acceptance, with your two brothers, one as drawer, and the other as endorser, payable at New York, your paying or including in said bill the *damages* on the

Orr *v.* Lacey.

present protested paper, to the amount of $3,500, and the interest for 6 months." Another letter from the cashier to the witness was then introduced, dated 17th Sept. 1840, stating in substance that the bearer of the letter, Mr. Daniel Brown, was one of the directors of the Bank, and entrusted with the adjustment of the claims of the Bank against him. The witness then proceeded further to testify, that he proposed to Brown to give the Bank a promissory note for the amount due, with sufficient sureties, payable at the counter of the Bank; that Brown declined the proposition, insisting on a bill payable in the City of New York, alleging as a reason, that the Bank could not afford to lay out of her money for six per cent. interest. That in reply, witness stated that, as the damages on a protested bill were ten per cent., renewing the bill every ninety days, would subject him to forty per cent. interest in one year; to which Brown replied that the law of Indiana allowed only five per cent. damages : That finally, Brown consented to take a bill at six months, so that it could be returned but twice in one year. The witness further testified that the bill declared on included the principal and interest due on the old bills, five per cent. damages, and interest at six per cent. during the time the new bill had to run; and that interest was calculated on the gross amount, inclusive of damages. It also appeared in testimony by the witness, that on giving to Brown the bill declared on, the old bills were surrendered.

John H. Porter, a witness on behalf of the defendant, testified that the bills of the Branches of the State Bank of Indiana, were, in 1840, at a discount of from eight to ten per cent., and that the difference of exchange between Niles, Michigan, and New York, was from eight to ten per cent. : he testified, further, *that Indiana money was then at par in business transactions, and that some preferred Indiana to Michigan funds.*

Rodney C. Payne, cashier of the Branch of the Farmers and Mechanics' Bank of Michigan, at Niles, corroborated the testimony of Porter, and, in addition, stated that Indiana money was good and safe, and at par in business transactions, and that he received it in payment of debts due the Farmers and Mechanics' Bank, but seldom paid it out.

Ezekiel Morrison testified that, in the spring of 1840, he paid five per cent., as the difference between specie and Indiana notes, and that the common rate was six per cent.: that the Indiana Banks suspended specie payment in July 1840, and that their notes were at a discount of from eight to ten per cent. until March 1841, but were at par in ordinary business transactions, and constituted the principal circulating medium of the country. The witness further testified that he was, in the spring of 1840, a director of the Michigan City Branch Bank, and never knew the Branch to pay out or receive Indiana Bank notes at a discount.

The laws of New York, and Indiana, as well as the charter of the Bank, were by stipulation admitted as part of the evidence in the cause.

Upon the evidence the court charged the jury as follows:

1st. That the contract declared on and proved, was to be governed by the laws of Michigan, and that if they found it usurious, they must render a verdict for the plaintiff for the whole amount of principal and interest due on the bill, less three times the excessive interest:

2d. That if the jury believed from the evidence, that O. P. Lacey applied to the bank for a loan of money on the bills of the date of 1st February, and April 14, 1840, and that said bills were made for the purpose of discount merely, and had no real existence prior to their negotiation at the Bank, and that the Bank discounted said bills

by paying to Lacey the amount specified therein, less the discount of six per cent. in the notes of other Branches of the State Bank of Indiana, which were at a discount in Michigan City, and did not offer Lacey, for whose benefit the bills were discounted, specie or its equivalent; and that the Bank resorted to this mode of discounting the bills, for the purpose of evading the law against usury, then the contract was usurious.

A verdict was rendered for the plaintiff for the sum of $4,313,60; from which, as was stated upon the argument, it was clear that the jury found the contract declared on usurious, and gave a verdict for the whole amount of principal and interest, less three times the excessive interest, according to the laws of this State.

A motion was made for a new trial, by the defendant, on the alleged grounds:

1st. That the court erred in admitting Obed P. Lacey to be sworn as a witness in the case; and

2d. That the contract declared on, is governed by the laws of New York, or Indiana, which declare all contracts infected with usury, absolutely void, and that, therefore, the charge of the court, which declares that the contract was to be governed by the laws of Michigan, was erroneous.

Before entering upon the discussion of the first question, it becomes necessary to recur to the facts, in order that there may be no misapprehension as to the extent or application of the rule to be laid down, respecting the admissibility as a witness, of a party to a negotiable instrument. From the evidence before us, it appears that the present action is by the Bank, the endorsee of the bill, against the drawer; and that the acceptor of the bill, for whose benefit the bills of February 1st, and April 14th, 1840, were discounted, was the person introduced as a wit-

ness in behalf of the defendant, to show a defence under the plea of the statute of usury.

If that part of the charge of the court which asserts that the contract declared on, was a Michigan contract and governed by the laws of Michigan, be correct, it is not perceived that any legal objection to the competency of O. P. Lacey as a witness could be taken, inasmuch as by the laws of Michigan, the contract could not be *void*, although tainted with usury. But as we entertain an opinion upon this point different from that expressed by the court below, and have come to the conclusion, that if the contract was founded upon a usurious consideration, it was *originally void*, we are necessarily led to consider the question, whether in this view of the case, O. P. Lacey was a competent witness. It is to be observed, also, that the bill in question was not negotiated, until actually delivered by O. P. Lacey, the acceptor, to Brown, who was the agent of the Bank; and the same remark will apply to the bills of February 1st, and April 14th, which were never actually negotiated, until delivered by O. P. Lacey to the Bank, for the purpose of discount. The question, then, upon which we are to pronounce a judgment, may in short, be thus stated : In an action on a bill of exchange, brought by the first endorsee, against the drawer, is the acceptor a competent witness to show it *void ;* the bill having been originally negotiated by the acceptor, and for his sole benefit, by delivering it to the endorsee for the purpose of discount? The general question, respecting the competency of a party to a negotiable instrument, to be admitted as a witness to prove it void at its inception, has been discussed with great ability both in England and in this country, and has been the subject of careful examination and repeated decision by many of the ablest judges who have adorned the bench at home and abroad. These decisions show that

courts distinguished for their learning have divided in opinion upon the question. Under these circumstances, we must adopt such a rule, as, from a critical review of the cases, appears most just and reasonable, and in accordance with those principles, by which the competency of witnesses is usually tested.

It is not to be expected that all the cases upon this vexed question will be noticed. I shall content myself with an examination of such as have come under my observation, and which develope, most fully, the reasoning adopted by judges in favor of and against the admission of a witness under the circumstances, and for the purpose stated.

The first case to be found in the English reports, and that to which almost all others refer, is that of *Walton and others, Assignees of Sutton* v. *Shelley*, 1 *T. R.* 296. That was an action on a bond given by the defendant to Sutton, to which there was a plea of *non est factum*, and another of the statute of usury. It was proved by one witness for the defendant, that the bond was given in consideration of the delivery up of two promissory notes made by a Mrs. Perry, payable to one Birch or order: the one endorsed by Birch and Davenport Sedley, the other by Birch, Corbin and Davenport Sedley, to Sutton. Davenport Sedley was then called by the defendant to prove that the consideration of the notes was usurious. But the evidence was objected to on two grounds; 1st. That he was called to invalidate a security which he had given; and that an endorser of a note, independently of any question of interest, could not be permitted to prove a note void, that he himself had endorsed: 2dly. That he was interested in the question which was meant to be put to him. Mr. Justice *Buller*, before whom the cause was tried rejected the witness, and upon a motion to set aside the verdict and grant a new trial, Lord *Mansfield*,

Chief Justice, in delivering his opinion, said : "In this case, it seems to me that the witness had no interest in the present question, for either way he is discharged.   If the bond be good, it puts an end to the notes ; if bad, the same ground that vacates the bond, vacates the notes : therefore, in point of *interest*, I think there is no objection to his competency.   But what strikes me is the rule of law founded on public policy, which I take to be this; that no party who has signed a paper or deed, shall ever be permitted to invalidate that instrument which he hath signed ; and there is a sound reason for it : for a party who has signed a paper gives a credit to it.   It is of consequence to mankind that no person should hang out false colors to deceive them, by first affixing his signature to a paper, and afterwards giving testimony to invalidate it.   And therefore, when a man signs those instruments, (notes) he is always understood to say, that, to his knowledge, there is no legal objection whatever to them."   *Willis, J.* after re-stating the ground assumed by Lord *Mansfield*, concluded his opinion by saying, that " the present case falls within the general rule, that no man shall be permitted to allege his own turpitude in having given credit to a false and illegal security."   The same course of reasoning was adopted by *Ashurst* and *Buller*, Justices, in pronouncing their judgments.

This decision was subsequently reviewed in the King's Bench, in the case of *Jordaine* v. *Lashbrooke,* 7 *T. R.* 599 ; and although the question was argued with distinguished ability by eminent counsel, who invoked the great name of Lord *Mansfield* in support of the doctrine laid down in the case of *Walton* v. *Shelley*, the court nevertheless overruled the authority of that case, and decided, that, in an action by an endorsee of a bill of exchange, against the acceptor, the latter may call the payee as a witness to prove that the bill was void in its creation.

The opinion of Lord *Kenyon*, C. J. shows that the question was not new to him, having arisen before him at *nisi prius*, where he had invariably expressed an opinion opposed to that of Lord *Mansfield* in the case of *Walton* v. *Shelley*. His opinion in the case of *Jordaine* v. *Lashbrooke*, is distinguished by a force and clearness of reasoning, well calculated to shake the foundation upon which the authority of the case of *Walton* v. *Shelley*, rests. In the course of his opinion, Lord *Kenyon* says, "The proposition attempted to be established by the plaintiff is this; that for some technical reason, or for some reasons of policy, a court of justice must shut its ears and not suffer facts to be disclosed, which may be laid before them by a witness who is not infamous in his character, and who has no interest in the cause. If the law be so, there is some novelty in it. I have always understood the rule to be that where a witness is infamous, and his record of conviction is produced, or where he is interested in the event of a cause, he cannot be received: but to carry the rule beyond that would be extending it further than policy, morality, or the interests of the public require." Mr. Justice *Ashurst*, who participated in the decision of the case of *Walton* v. *Shelley*, adhered to the views expressed by him in that case, but the other justices, *Grose and Lawrence*, delivered opinions coinciding with that of the Chief Justice. In the course of his opinion Mr. Justice *Ashurst* made use of the following language : " The great source of the flourishing state of the kingdom is its trade and commerce ; and paper currency, guarded by proper regulations and restrictions, is the life : and I cannot but think that it might be very detrimental to the commerce of this kingdom, and to paper credit, if men, after they have put their names upon a bill of exchange, and, by that means, as far as in them lay, given it a credit and a currency in the world, should be permit-

ted to annul their own act, to practice a fraud upon the world, and to give the lie to what they have attested, and thereby overturn their own security." Commercial policy, seems to have been the ground on which he was of opinion, that the decision in the case of *Walton* v. *Shelley* should be sustained. The force of the reason will be admitted, when it is considered, that upon her trade and commerce depends to a great extent the prosperity of Great Britain, and that bills of exchange enter into almost all important commercial transactions. This course of reasoning, might very well influence the course of decision in England upon the question before us, and warrant the adoption of a rule there, which would be inapplicable here. The rule as settled in the case of *Jordaine* v. *Lashbrooke*, that a party to a negotiable instrument is a competent witness to prove any fact, to which any other witness would be competent to testify, provided he is not otherwise legally incompetent, has been acquiesced in, and is believed to be the established doctrine of the English Courts at the present day.

In the case of the *Bank of the United States* v. *Dunn*, 6 Peters 51, the Supreme Court of the United States affirmed the doctrine laid down in the case of *Walton* v. *Shelley*. Mr. Justice *McLean*, in delivering the opinion of the court remarked that, it was a well settled principle, " that no man who was a party to a negotiable instrument, shall be permitted, by his own testimony, to invalidate it. Having given it the sanction of his name, and thereby added to the value of the instrument, by giving it currency, he shall not be permitted to testify that the note was given for a gambling consideration, or under any other circumstances which would destroy its validity. This doctrine is clearly laid down in the case of *Walton* v. *Shelley, and is still held to be law.*" In the case of the *Bank of the Metropolis* v. *Jones*, 8 Peters, 12, the rule laid down

in 6 Pet. 51, was reconsidered and affirmed. Mr. Justice *Barbour* after quoting from the opinion of Mr. Justice *McLean*, says, that the "doctrine of that case *is sustained by reason and authority."*

The next case in order is that of *U. S.* v. *Leffler*, 11 Peters 86. It was there determined that the principle settled in the case of the *Bank U. S.* v. *Dunn*, "does not extend to any other case, to which the reasoning does not apply;" and the decision of the Circuit Court of the United States for the eastern district of Virginia, admitting the principal in the bond declared upon to prove that one of the co-obligors had executed the bond on condition that others would execute it, was affirmed by the supreme court.

The next and last case involving the question under consideration, is that of *Scott* v. *Lloyd*, 12 Peters 145. The supreme court of the United States in that case, held, that where the grantor of an annuity by deed, has conveyed all his interest in the property charged with the annuity, and an allegation of usury in the granting of the annuity is afterwards made, he may be a witness to prove usury.

In *Churchill* v. *Suter*, 4 Mass. R. 156, the facts were, that the defendant made a note payable to one Charles Copeland or order, which Copeland endorsed in blank; and which, to raise money, they delivered to one Bartlett, a broker, to negotiate in the market; who also endorsed it in blank, and sold it to the plaintiff. The question arose as to whether the endorsers were competent witnesses to prove an usurious consideration, under the facts above stated, and the further fact, *that Bartlett did not inform the plaintiff that the note was made to sell in the market,* and that the whole bargain consisted in a simple offer and acceptance of ninety four per cent. for the note. Chief Justice *Parsons*, in giving the opinion of the court, remarked, after a review of the English cases in respect to the admission

of a party to an instrument, as a witness, to prove it void in its creation, that, " no conclusion, on either side, can with certainty be drawn." The Chief Justice then says : " More than twenty years ago, after a full argument, the court unanimously decided that the testimony of the parties to the note should not be admitted ; and the decision has been uniformly adhered to. In this court, therefore, there has been no diversity of practice : and if we admit the endorsers in this case, we must overturn a series of our own decisions." After considering the case in reference to public convenience and to private morals, in which the reasoning in the case of *Walton* v. *Shelley* is adopted, the Chief Justice further said that in the case before them, to admit the parties to the illegal contract as witnesses, would not tend to suppress fraud, but to encourage it, by enabling the parties to it to enjoy all the beneficial fruits of it, and to throw the mischievous consequences on an *innocent endorsee.* The decision in this case may well be upheld, on two grounds : 1st. The rule as established in the case of *Walton* v. *Shelley*, had been affirmed by the supreme court of Massachusetts, and acted upon for more than twenty years ; and 2d. To permit the endorsers to prove the usury alleged, would be to enable parties to a fraud to throw the mischievous consequences of it on an *innocent endorsee.* In the case of *Fox* v. *Whitney*, 16 Mass. R. 118, it was held competent for an administrator, in an action against him, by the administrator of the promisee of a negotiable note, made by his intestate, to prove the note to have been given upon an usurious consideration ; and that a person who had signed the note as surety, although not so expressed in the note, was a competent witness to prove such consideration. Chief Justice *Parker*, who delivered the opinion of the court, said, that the rule by which parties to notes were excluded from being witnesses, to discredit the security to which they had given currency, did

not apply to the case before them : that the principle on which the case of *Churchill* v. *Suter* rested, did not apply, because the note remained in the hands of the original promisee ; and no innocent endorsee could be prejudiced, the contest being between the original parties to the illegal contract.   In the case of *Packard* v. *Richardson*, 17 Mass. R. 122, the case of *Churchill* v. *Suter* was again considered, and the principle there laid down was re-affirmed.   In the recent case of *Thayer* v. *Crossman*, 1 Metc. R. 416, the cases from Massachusetts above cited are reviewed, and the rule they established is stated and vindicated by Chief Justice *Shaw*.

The supreme court of New York, in the case of *Winter* v. *Saidler*, 3 John. Cas. 185, held, that a person is not a competent witness, to impeach the validity of a negotiable note, or instrument, which he has made or endorsed, though he is not interested in the event of the suit.   It is worthy of remark, however, that the rule there established was in opposition to the opinions of *Kent* and *Radcliffe*, justices.   The former, after a critical and able review of the English cases on the subject, rejects the authority of the case of *Walton* v. *Shelley*.   The case of *Winter* v. *Saidler* was subsequently called in question, and finally overthrown, by a series of decisions in the supreme court of New York : (See *Stafford* v. *Rice*, 5 Cowen 23 ; *Bank of Utica* v. *Hilliard*, Id. 153 ; *Williams* v. *Walbridge*, 3 Wend. 415.)

The supreme court of New Hampshire, after a careful examination of all the reported cases, were of opinion " that the rule must be limited to cases, where the party to a negotiable instrument is called to testify facts which render the note void, *even in the hands of a bona fide endorsee, for a valuable consideration, without notice*."   *Bryant* v. *Ritterbush*, 2 N. H. Rep. 212.   The authority of the case of *Walton* v. *Shelley* is confirmed in the case of *Deering*

v. *Sawtell*, 4 Greenl. R. 193 ; and *Chandler* v. *Morton*, 5 Id. 375.    In the former case, *Weston*, Justice, said that a rule which had been so uniformly adhered to in Massachusetts and Maine, could not be called in question.

It would also seem that the rule as established in Massachusetts, Maine and New Hampshire, has been sustained by the courts of Pennsylvania, Louisiana and Mississippi.    In Vermont the decisions have vacillated.    The case of *Jordaine* v. *Lashbrooke* was followed in *Nichols* v. *Holgate*, 2 Aik. R. 138, but this decision is said to have been disapproved by all the judges, in *Chandler* v. *Mason*, 2 Verm. R. 198.    The general doctrine of *Jordaine* v. *Lashbrooke* has been followed in New York ; Virginia ; *(Taylor* v. *Beck*, 3 Rand. R. 316.)    Connecticut ; *(Townsend* v. *Bush*, 1 Conn. R. 260.)    South Carolina ; *(Knight* v. *Packard*, 3 McCord, 71.)    Tennessee ; (2 Yerger, 35.)    Maryland, (*Ringgold* v. *Tyson*, 3 Harr. and John. R. 172.)    New Jersey ; *(Freeman* v. *Buttin*, 2 Harr. R. 192.)    North Carolina ; *(Guy* v. *Hall*, 3 Murphy, 151.)    Georgia ; *(Slack* v. *Moss*, 1 Dudley, 161.)    Alabama ; *(Todd* v. *Stafford*, 1 Stew. R. 199.)

I have thus reviewed, at some length, a few of the many adjudications involving the important question before us, and stated as far as I have been able to do so, the rule which has been adopted by the courts of the several states.    Before proceeding to examine the question upon general principles, it may be proper to correct a misapprehension which might arise from the language of the court in the leading case of the *Bank of the U. S.* v. *Dunn*. The doctrine of that case is said to be clearly laid down in *Walton* v. *Shelley*, and still held to be law.    If the learned judge by whom that opinion was delivered, meant to affirm that the rule as laid down in *Walton* v. *Shelley* was still held to be law in England, it is apprehended, that the remark is not supported by any adjudged cases

Orr *v.* Lacey.

to be found in the English reports, since the decision of
*Jordaine* v. *Lashbrooke.*    A brief examination of a few
elementary works of approved authority, and a reference
to adjudged cases, will prove, very conclusively, that the
rule as laid down by the King's Bench, in *Jordaine* v.
*Lashbrooke,* has been regarded and acted upon, as settled
law in England, from the year 1798 to the present day. *Chit-
ty,* in his treatise on bills of exchange, p. 413, states the gen-
eral rule to be, that it is no objection to the *competency* of a
witness, that he is a party to the same bill or note, unless
he be *directly* interested in the result of the suit; and
though it was formerly held, that no party should be per-
mitted to invalidate an instrument he had signed, a con-
trary rule now prevails.    In stating the rule laid down in
*Walton* v. *Shelley, Phillips,* in Vol. 1, p. 43 of his work on
evidence, says, that it appears to have been the first case
in support of such a rule, and that the contrary seems now
to be fully established.    A party to a bill is competent to
prove that it is void; although the contrary was once held.
1 Stark. Ev. 179.    The rule now received in England, is,
that the party to any instrument, whether negotiable or
not, is a competent witness to prove any fact, to which
any other witness would be competent to testify; provi-
ded he is not shewn to be legally infamous, and is not in-
terested in the event of the suit.    1 Greenl. Ev. 429.
*Peake,* in his law of evidence, considers the rule laid down
in *Walton* v. *Shelley,* as no longer existing, after the sol-
emn decision of the court in the case of *Jordaine* v. *Lash-
brooke.*

In the case of *Jones* v. *Brook,* 4 Taunt. 464, tried in
1808, it became a question whether the wife of the drawer
of the bill was a competent witness, in an action against
the acceptor, to prove usury; the evidence of the wife
having been received, a rule *nisi* was obtained to set aside
the verdict, on the ground that the witness ought not to

have been admitted. *Best* and *Pell*, who showed cause against the rule, said, *arguendo*, that the question was decided by the authority of *Jordaine* v. *Lashbrooke;* since which the rule no longer prevailed, that a person could not be called to invalidate an instrument to which he had set his name. *Shepard* and *Vaughn* in support of the rule, said they would not attempt to combat the doctrine laid down in *Jordaine* v. *Lashbrooke. Mansfield,* Chief Justice, in the course of his opinion, uses this language: " An objection was taken to the witness, who was the wife of the drawer; and the objection was overruled, on the ground that it was now the practice to receive persons whose names are on bills of exchange, as witnesses to impeach such bills: and so it is, &c." The admissions of counsel, strengthened and supported by the eminent judge, who gave the leading opinion in the case of *Walton* v. *Shelley,* are conclusive to show, that in 1808, ten years after the decision of *Jordaine* v. *Lashbrooke,* the authority of that case had not been shaken. In the case of *United States* v. *Leffler,* 11 Peters 95, Mr. Justice *Barbour* remarks that " the case of *Jordaine* v. *Lashbrooke* overruled the case of *Walton* v. *Shelley,* by deciding that, in an action by the endorsee of a bill of exchange against the acceptor, the latter may call the payee as a witness, to prove that the bill was void in its creation; *and such is the doctrine which has since been held in England."* These references prove, beyond doubt, that the case of *Walton* v. *Shelley* is not now, and has not been, law in England, for nearly half a century. And it certainly cannot be said to have been law in this country, when its authority has been denied by the highest judicial tribunals in several of the states of the Union.

Let us now examine the question on principle. *Mansfield,* Chief Justice, predicates the rule laid down in *Walton* v. *Shelley,* on public policy, which forbids a party who

has signed a paper or deed to give testimony to invalidate the instrument which he has signed : and it would seem, that the learned Chief Justice supposed, that the rule thus laid down, falls within the spirit of the maxim of the Roman law, *nemo, allegans suam turpitudinem, est audiendus.* Now in respect to this maxim, it is denied that any such exists; Gilman's Rep. 275–6. But admitting the existence of the maxim, which is certainly founded in sound morality and propriety, yet, with all due deference, it is apprehended, that the Chief Justice misapplied it to the case then before him. Evans, in a note to the translation of Pothier on Obligations, (Vol. 2, p. 276,) refers to the application of this maxim, by Lord *Mansfield*, in the case of *Walton* v. *Shelley ;* and says : " I conceive, however, the real principle of the maxim is no more than that a person shall not found a claim, or defence, upon his own iniquity, and that it has no relation to the case of a witness ; and, in fact, it must in general be very difficult to conceive that a person would be inclined, as a witness, to state his own misconduct, in opposition to the truth, unless he appeared to have some motive for doing so, connected with the event of the cause." Chancellor *Kent*, in considering the maxim, *nemo allegans, &c.*, says that " it is applicable to *parties* rather than to *witnesses ;* and it goes no more to the exclusion of witnesses in civil, than in criminal cases." 3 John. Cas. 192. Such, unquestionably, is the true meaning of the maxim of the civil law, which has been incorporated into the common law, as it is liberally applied, both by the courts of common law and equity, in England and in this country. Let us now address ourselves to that principle of public policy, which excludes a party who has signed a paper or deed, from giving testimony to invalidate it. The reason given for the rule by Lord *Mansfield* is, that a person who signs such an instrument gives credit to it ; and that it is of consequence to

mankind that no person should hang out false colors to deceive them, by first affixing his signature to a paper, and then afterwards giving testimony to invalidate it. How far the rule laid down by Lord *Mansfield*, has been adopted in practice by the courts in this country, will be seen by reference to the adjudged cases I have had occasion to refer to, in the progress of this opinion. It is sufficient here, to state, that it never has been applied, either in England or this country, to the extent which the general language used by Lord *Mansfield* would warrant. It has been frittered away, and restricted in its application, by almost all the decisions, to *negotiable instruments* in the hands of an innocent holder. In a well considered opinion by Chief Justice *Shaw, ( Thayer* v. *Crossman,* 1 Metc. R. 416,) that able judge examined the rule, in order to ascertain its extent, limits and qualifications; and excluded from its operation the case, where an endorser was offered as a witness to prove a note paid before it was endorsed; the endorsement having been made after the note was due, and the action being by the endorsee against the maker. He denies, also, that the rule can be applied, as between the original parties, and to a note not negotiated and put in circulation. But it is unnecessary to multiply authorities to show, that the comprehensive rule laid down by Lord *Mansfield*, has been restricted in practice, to such an extent as to render it almost harmless. A few remarks as to the reason of the rule: If it is of consequence to mankind that no person shall hang out false colors to deceive them, by affixing his signature to a paper, and afterwards giving testimony to invalidate it, it is of greater consequence to mankind that violations of law, and fraud, should be detected and punished; and that courts should not, in the language of Lord *Kenyon*, " for some technical reason, or for some reason of policy, shut their ears, and not suffer facts to be disclosed, which may be

laid before them by a witness of irreproachable charac-
ter, and not interested in the event of the suit." A forci-
ble illustration of the danger and injustice of such a rule
is stated by Lord *Kenyon* in the case of *Jordaine* v. *Lash-*
*brooke:* "The rule contended for by the plaintiff," (says
his Lordship,) "is this, that however infamously you (the
defendant) have been used, whatever fraud may have
been committed on you, whatever may be the right of
other persons, if I, (the plaintiff,) the party to the fraud,
can get on the instrument the name of the person who
may be the only witness to the transaction, I will stand
entrenched within the forms of law, and impose silence
on that only witness, though he may be a person of unim-
peachable character, and not interested in the cause."
This illustration presents in a strong and clear light, the
enormities which the adoption of the rule of exclusion
laid down in *Walton* v. *Shelley* would sanction.   We can-
not put the seal of our approbation upon a doctrine
fraught with so much mischief.   We cannot sanction a
rule of evidence which would shut out from investigation
the thousand cases of fraud that are constantly occur-
ring, and for which no remedy could be provided, if that
rule is to be considered binding or obligatory.   We can-
not invite persons to come into our courts and expose vio-
lations of law and fraud, if he who violates the law, or
perpetrates the fraud is to find security and shelter in
some vague, and fanciful rule of policy.   Again; it is
admitted that the rule of exclusion adopted in *Walton* v.
*Shelley* is an exception to the general rule by which the
competency of witnesses is tested.   It is of great conse-
quence that that general rule should be preserved invio-
late ; and that exceptions should not be multiplied, unless
demanded by a reason so strong and irresistible as to out-
weigh the reasons on which the general rule itself is
founded.   Once destroy the landmarks by which courts

are guided in determining the competency of witnesses, and we shall soon reap all the consequences which invariably follow a departure from a rule long established, well defined, and capable of instant and easy application. We shall be subjected to the uncertainties, inconveniences, and vexations, resulting from a series of inconsistent and vibrating decisions, from which we were rescued by the decision in the case of *Bent* v. *Baker*, 3 T. R. 34. The refined, subtle, and sometimes incomprehensible grounds, on which witnesses were rejected as incompetent, gave way to the rule which is now so universally adopted. We can now distinguish between that accurate and direct interest which goes to the competency of testimony, and that influence which merely affects the credit of it. The tendency of modern legislation, and the more recent adjudications in our courts, is rather to restrict, than enlarge the objections which go to the competency of testimony.

O. P. Lacey was not legally interested in the event of the cause. The original bills, as well as the one on which this suit was brought, were made and discounted for his exclusive benefit. The contract for discounting them was made between him and the real plaintiffs in this case: they were the original parties to the transaction. The drawer of the bill, who, for aught that appears, was in no respect conversant with the facts or circumstances respecting the negotiation of the original bills, is now sued, and offers to show by O. P. Lacey, the acceptor, that the contract declared upon is tainted with usury. The court below received his testimony, and I think, both upon principle and authority, that its ruling in this respect, was legal and proper.

2. The next question to be determined, is, whether that part of the charge of the court, by which the jury were directed, in the event that they found the contract declared upon was usurious, to render a verdict for the

plaintiff for the amount appearing to be due on the contract, less three times the excessive interest, can, upon correct legal principles be sustained. The instruction thus given to the jury, was founded upon the opinion that the contract was governed by the laws of this state, and not by the laws of New York or Indiana, which rendered void all contracts infected with usury. It is to be observed that the real plaintiff in this cause, is a corporation created by a law of the state of Indiana. The capacity of this corporation to make a contract, therefore, must be tested by that law. There is no doubt that the bank had authority under its charter, to discount the bills of the 1st February, and 14th April, 1840. The act of incorporation authorizes the bank "to discount, on banking principles and usages, bills of exchange, &c.;" and upon loans or discounts, the bank is also authorized " to receive six per cent. per annum, and no more." From the evidence in this cause it is clear, that no more than six per cent. was charged or reserved by way of interest, at the time the original bills were discounted: it is equally clear, that the bills or notes received by O. P. Lacey from the bank, were at a discount of from six to ten per cent.: and it is contended, that, although the nominal amount received in bank notes, less the discount of six per cent., was equal to the amount specified in the two bills of exchange, yet the transaction was usurious. The reasoning by which the defendant endeavors to sustain this conclusion, is, that the charter of the bank, contemplates that six per cent. and no more, can be reserved upon a loan of *money*, or that which is its equivalent in value. Thus, if a loan is asked of $100 for a year, and the bank gives to the person to whom the loan is made $94, in the current coin of the United States, the transaction is unexceptionable; but if, instead of giving to the borrower $94 in coin, the bank gives $94 in bank bills which are depreci-

ated below the specie standard ten per cent., the borrow-
er in point of fact, receives only $84, and the reservation
of six per cent. on $100 is a plain and direct infraction of
the charter.   The defendant, in other words, contends
that the current value of the bills or notes he received, at
the time of lending and borrowing, was to be considered
their real value, and that the amount reserved by way of
interest, should be regulated by the real, and not the nom-
inal value of the bills or notes so received.   There is
nothing in the  case to show that the bank was insolvent
at  the time the loan was made.   On  the contrary, it ap-
pears that the  bills issued by  the bank, constituted  the
principal circulating  medium of the country; that for all
ordinary porposes, and in  all business transactions, a one
dollar bill of the bank, was equivalent to  a dollar in cur-
rent coin;  that the bank  paid out and received the  bills
of the several branches of the parent institution, without
discount;  and  that the bills of the  bank were received
at the the Farmers and Mechanics' Bank of Michigan at
Niles  for  debts, and passed current in the community.
From  the evidence before us, it would also appear that
the bank did  not suspend the payment of its obligations,
in specie, until July, 1840.   Where a contract, on its face,
imports that a greater rate of interest was reserved, than
is allowed by law, there is no  room left for presumption;
the intent is  apparent.   But in cases like that before us,
where the  contract *appears* to have been  fairly made,
there is nothing on its face from which the *law* would im-
ply that a  violation of the charter  was  contemplated by
the plaintiffs, at the time the  bills were discounted.   To
constitute usury, it must be clearly established, that there
existed an intention to take usurious interest: for, if nei-
ther party intended a violation of law, and  acted  bona
fide, the law will not infer a  corrupt agreement ; and the
same principle would  apply to  the prohibittion in the char-

ter of a bank. *Bank of the United States* v. *Waggoner*, 9 Peters 399, and cases there cited. See also, 13 Pet. 65. But if the plaintiffs, with a view to secure a greater rate of interest than is allowed by law, paid out depreciated notes, they will be held responsible for all the consequences of such an act. The question of intent, is properly referrible to a jury, who are to determine it. The charge upon this point, appears to me to have been proper: indeed, I am not aware that any exception was taken to it.

Supposing, however, that the jury should find that the facts warrant the presumption that the payment by the bank to O. P. Lacey, of depreciated bank notes, was a device, by which to obtain a greater rate of interest than is allowed by law:—it then becomes important to determine whether the contract is absolutely void, or whether, according to our laws, the plaintiff only forfeits three times the usurious interest. A corporation possesses only those powers expressly given by its charter. Among those granted to the Indiana State Bank, is a power to discount bills and loan money, reserving upon such loan six per cent. per annum, and no more. There is no provision in the charter which declares that a contract reserving more than six per cent, shall be void. No principle, however, is, at this day, better settled, than that a court will never carry into effect a contract made in violation of a positive law, any more than they would a contract founded on an immoral consideration. If, therefore, there was an incapacity on the part of the bank to make the contract declared upon, or, if that contract was made in violation of its charter, a court of justice will not lend its aid to carry it into execution. How far is the principle I have thus laid down, applicable to the present case? The contract sued upon was made in Michigan, to be performed in New York. On the part of the defendant, it was insisted that if the jury found that the consideration

of the contract was usurious, the plaintiff could not recover, as by the laws of New York, the place of performance, all such contracts are declared to be void. The general principle in relation to contracts made in one place, to be executed at another, is well settled :—they are to be governed by the laws of the place of performance. And in respect to interest, if by the laws of the place of performance, a greater rate of interest is allowed, than that permitted at the place of the contract, the parties may stipulate for the higher interest. *Andrews* v. *Pond*, 13 Peters, 65. But it is unnecessary to determine this question, as it is shown that the contract in this case must be governed by the law of Indiana incorporating the bank. If the original contract was void in consequence of a want of power on the part of the bank to make that contract, and if the bill in the present case, in the language of the Supreme Court of the United States, in the case of *Armstrong* v. *Toler*, 11 Wheat. 258, grew out of the illegal act, a court of justice will not enforce it. If, for instance, a suit had been brought in this state, on the original contract between the parties, and a jury, under proper instructions, had found that that contract involved a violation of the charter of the bank, which is its constitution, the law would pronounce the contract void :— not because the bank had violated the general usury law of Indiana, but because it had violated the law of its creation, which limits and restricts it in respect to the contracts it may lawfully make. Now, if it shall appear that the contract upon which this suit is brought, grew out of the illegal contract first entered into between the parties, or, in other words, was not a new contract, founded upon a new consideration, it would appear too clear for argument, that this new contract comes before us with all the infirmities which attached to the old one. The reason is obvious : the original agreement being void, for want of

capacity on the part of the bank to contract, and the new agreement being a renewal of the old one, it is tainted with the illegality which attached to the latter; and, as the courts of Indiana, if a suit had been there instituted on the bill declared upon, would have pronounced it void, as having been inseparably connected with the contract out of which it grew, so the courts of this state will examine into the capacity of the bank to make a contract, and if it discovers a want of capacity to make the one on which a recovery is sought, they will not carry it into effect. That the contract in the present case was infected by the illegality, if any existed, which attached to the one out of which it grew, there can be no doubt. See *Smith* v. *Barstow*, ante, 155. The charge of the court, then, should have been, that, if the jury found the original agreement between the parties illegal, it was their duty to find a general verdict for the defendant.

It is proper to remark, that this view was not brought to the attention of the court below. The great struggle on the part of counsel seemed to be, on the one hand, to support the contract declared upon, by the laws of Michigan, and on the other hand, to apply to it the law of New York, without reference to the fact that the plaintiff was a corporation—a legal entity,—whose powers were restricted, limited, and controlled, by the law of its being.

We can no more lend our aid in carrying into execution the agreement now sought to be enforced, if it involve a violation of the charter of the bank, than we could carry into effect any other contract made by the bank, for the purchase of lands, mills, or other property, though that contract were made in this state.

*New trial granted.*