D. M. Perkins, Plaintiff in Error, v. Samuel Watson, Trustee.

# D. M. PERKINS, Plaintiff in Error, v. SAMUEL WATSON, Trustee.

1. BANKING CORPORATIONS. *Usurious interest. General laws applicable to, as individuals.* When a charter is silent as to any violation of the limitation imposed upon the bank in lending money, the general laws against taking unlawful interest are applicable, and the bank in such case can only be treated as a natural person would be for a similar infraction of law; its contracts are void only for the excess had above the legal interest and reasonable exchange.

   Cases cited: 4 S. & M., 75; 8 *Ib.*, 151; 40 Me., 109; 13 Conn., 249; Dill v. Ellicott (Taney Circuit Court Decisions); U. S. v. Owens, 2 Peters, 527; Bank of Chillicothe v. Swayne, 8 Ohio, 252; Rock River Bank v. Sherwood, 10 Wisconsin, 230; Creed v. The Commercial Bank of Cincinnati, 11 Ohio, 489; Spaulding v. The Bank of Muskingum, 12 Ohio, 544; Orr v. Lacey, 2 Doug., 230; Commercial Bank of Manchester v. Nolan et al., 7 How. Miss., 508; McLean, assignee, etc., of Manard, v. The Lafayette Bank et al., 3 McLean, 587; Wetmore v. Brien & Bradley, 3 Head, 723.

   Acts cited: 1741, ch. 11, clause 2d, 1838, 1855, Constitution of 1834.

2. SAME. *Same. Contracts. Prohibition implied and expressed.* When contracts are prohibited by statute, the prohibition is sometimes expressed, and at others implied. Whenever the law imposes a penalty for making a contract it impliedly forbids the same, and when a contract is prohibited, either expressly or by implication, it is illegal and can not be enforced.

   Cases cited: Bensley v. Bignold, B. & A. L. D., 335; Foster v. Taylor, 5 B. & A. L. D., 887; Cope v. Rowlands, 2 M. & W., 149.

3. NOTES. *Accommodation endorser. Liability of.* Where a principal discounts a bill at a greater rate of discount than 6 per cent., this will not be such a fraud upon an accommodation endorser as to discharge him from all liability upon the bill.

---

### FROM LINCOLN.

---

Appeal from the Circuit Court. WM. P. HICKERSON, Judge.

J. W. Newman, E. Cooper and J. A. Warder for Perkins.

J. B. Heiskell, Attorney General, for the State.

Burton, Special J., delivered the opinion of the Court.

On the 18th of April, 1861, Kelso & McDonald drew a bill of exchange (acceptance waived) on Beadley, Wilson & Co., of New Orleans, for ten thousand dollars, indorsed by the plaintiff in error, and one Cornelius Allen. The bill was discounted by the Bank of Tennessee, at Nashville; it was drawn at nine months, and being unpaid at maturity, it was regularly protested. In 1867. suit was commenced upon the bill against McDonald and the two endorsers by Samuel Watson, the assignee in trust of the bank. In the progress of the cause McDonald was discharged on a plea of bankruptcy, and the cause proceeded against the other two defendants. At the November term, 1871, the cause was tried by a jury of Lincoln County, before the Hon. William P. Hickerson, Judge of the Circuit Court. The trial resulted in a verdict of $14,240.47 against the defendants. A motion for a new trial was entered and continued over until the next term, when the motion was overruled, and D. M. Perkins (one of the defendants) appealed to this Court. The jury found the special fact that the bank took one hundred and thirty dollars of usury when they discounted the bill. This amount was deducted from the face of the bill,

D. M. Perkins, Plaintiff in Error, v. Samuel Watson, Trustee.

and the verdict was for the balance and the interest thereon.

The errors assigned will be seen by the following extracts from the instructions given to the jury by his Honor, the Circuit Judge: "It is next insisted that the bank received more by way of interest or exchange than it was allowed by its charter to collect upon the discount of this bill, and therefore the contract was not only void as to the excess received by way of interest or exchange, but is void as to the whole bill. . . If the proof satisfies you that the bank, in discounting this bill, discounted therefrom more than six per cent. interest for the time the bill had to run, or more than a reasonable rate by way of exchange between Nashville and New Orleans, then the transaction would be usurious to the extent of the excess had by way of interest or exchange over and above six per cent. and reasonable exchange." The Court also instructed the jury that the Act of 1859–60, prohibiting banks in a state of suspension from charging more than one per cent. for exchange, applied to the Bank of Tennessee, if in point of fact that institution was in a state of suspension when the bill in suit was discounted. Upon this point then there was no error committed against the appellant, and indeed that is not the point relied upon.

It will be perceived that his Honor was of opinion that the general usury laws applicable to indi-

viduals or natural persons were also applicable to the corporation or artificial person—the Bank of Tennessee; and therefore the contract by which this bill was discounted is only void as to the excess over and above six per cent., applying the same rule of construction to this contract as though it had been made between natural persons. On the other hand, it is insisted by the appellant that the bank, having discounted the bill at a greater rate of discount than is allowed by its charter, the contract is void, not because it violated the usury laws, but because it is such a contract as the bank had no power or capacity to make. The bank, it is said, is the mere creature of its charter, and derives all its powers and capacities from the law of its creation, and if it exceed the rate of interest allowed by its charter, the contract is *ultra vires* and void *in toto.*

We proceed then to inquire whether or not his Honor was correct in assuming that the general usury laws of the State apply to contracts made by the Bank of Tennessee.

Ever since the Act of 1819 the statutory law has been that when money is loaned at more than six per cent., the party could recover the principal and simple interest, and the excess over six per cent. alone was usury. This was a radical change of the North Carolina Act of 1741, chapter 11, clause 2d, before that time in force, by which contracts whereby more than six pounds in the hundred were taken for the use of money loaned per annum was declared to

D. M. Perkins, Plaintiff in Error, v. Samuel Watkins, Trustee.

be utterly void.    Notwithstanding the Act of 1819, the Legislature had granted to banks and to other moneyed corporations the privilege of taking more than six per cent. for the use of money, and these special charters, or rather this privilege granted to them, gave rise to § 6, Article XI. of the Constitution of 1834, whereby it is provided that "the Legislature shall fix the rate of interest, and the rate so established shall be equal and uniform throughout the State."   That the object of this provision was to inhibit the Legislature from granting to banking corporations the privilege of taking a greater rate of interest than was allowed to individuals, is manifest from the journals of the Convention.    The Journal of the Convention of 1834, p. 161–162.    Some four years after the Constitution of 1834 went into effect, the Legislature passed the Act establishing the "Bank of Tennessee," on the 19th day of January, 1838. This Act is very lengthy, and was prepared with great apparent care and deliberation, but it is not thought necessary for the purpose of this discussion to notice particularly more than two of its provisions.

Section 9 is as follows: "Be it enacted, that the following powers, rules, conditions, limitations and restrictions shall be fundamental laws of said bank, viz." Following this general provision are various "*Articles*," thirteen in number, providing for the election and compensation of officers, and making various minute provisions as to how they should conduct the

12.   vol. 2

D. M. Perkins, Plaintiff in Error, *v.* Samuel Watkins, Trustee.

banking business proper.    So much of Article 4 as
is relevant is embraced in these words: "They shall
. . . deal in bills of exchange . . . and dis-
count notes at said bank, with two or more good
indorsers thereon, at a rate of interest not exceeding
*six per cent. per annum; provided,* that this article
shall not be construed so as to prevent said bank
from demanding and receiving a reasonable premium
for exchange in addition to the interest upon bills or
notes payable at a point beyond the limits of this
State."

Here it is perceived that no exclusive privilege or
franchise is granted to the bank, so far as the power
to discount notes is concerned.    But they are put
upon precisely the same footing in this respect that
natural persons are by the general statutory law,
neither being allowed to take more than six per cent.
per annum for the loan of money.    It is to be fur-
ther observed that the bank charter nowhere declares
what shall be the consequences of a violation of the
charter by taking more than the allowed per cent.
No penalty or forfeiture is prescribed by the charter,
and this we think is significant, in view of the fact
that other violations of 'the rules declared to be
fundamental by this charter are visited by the severest
penalties.    For instance, Article 5, under § 9, pre-
scribes that the total amount of debts which the bank
shall owe at any given time shall not exceed twice
the amount of the capital stock paid in over and
above the moneys actually on deposit for safe-keeping.

And by the following section, in case of a violation of this Article the Directors, under whose administration it happens, are made individually liable therefor to the creditors of the bank.

Now, when we see that the Legislature has so carefully guarded against this violation of the charter, it is fairly to be inferred that had they intended that a violation of the charter by lending money should be visited by the penalty of the forfeiture of the whole sum to the borrower, that intention would have been expressed in the most unequivocal terms. In case, then, the banking law is violated, and the charter affixes no penalty for such violation, we can only look to the general statutory law to ascertain the consequences of such violation, and both upon reason and authority the act of the bank in taking excessive interest can only be viewed and treated as the act of a natural person would be for a similar infraction of law. 4 Smedes & Marshall, 75; 8 Ib., 151; 40 Me., 109; 13 Conn., 249.

We have thus far considered this case as though it were that of a corporation towards which the State of Tennessee stood indifferent. But when it is remembered that in this institution the State is the sole stockholder, the improbability that the Legislature intended the consequence insisted upon by the appellant is greatly enhanced. Upon the foregoing reasoning and authority we would be content to rest our conclusions that his Honor, the Circuit Judge, was right in applying the general usury laws to this transaction. Several authorities, however, have been earnestly pressed upon

D. M. Perkins, Plaintiff in Error, *v.* Samuel Watkins, Trustee.

us, and we will proceed to notice them or such of them as are most insisted upon.

*Dill* v. *Ellicott* (Taney's Circuit Court decisions), decided by Chief Justice Taney, is relied upon by appellants, and is as follows:    To an action brought by the endorsee against the acceptors of a·bill of exchange the defendants pleaded that the bill was given to secure the payment of money loaned by the plaintiffs to the payee of the bill, upon which an interest exceeding six per cent. was reserved, and that such contract was usurious, and the plaintiff not entitled to maintain an action upon it.    To this plea the plaintiff demurred, and the question. made by the pleading was whether an action could be maintained under the  Constitution of Maryland, adopted in 1851, when an interest of more than six per cent. was reserved or received.

The section of the Constitution was in the following words:   That the rate of interest in. this State shall not exceed six per cent. per annum, and no higher rate shall be taken or demanded; and the Legislature shall provide by law all necessary forfeitures and penalties against usury.",

Before and at the time. this Constitution was adopted an Act of Assembly was in force, by which the lender was entitled to recover the amount actually loaned with six per cent. interest upon it, although the contract was usurious.    The points decided by the Chief Justice were :

1. That the provisions of this Act were inconsistent

D. M. Perkins, Plaintiff in Error, v. Samuel Watkins, Trustee.

with the clause of the Constitution before recited, and therefore repealed by it.

2. That a contract in violation of the Constitutional provision was void for the whole amount, although the Legislature had not at the time provided for penalties and forfeitures against usury, as they are thereby required to do.

We have carefully considered this case, and are unable to see its application to the case in hand. The parties were natural persons and therefore it has no relevancy to a discussion of corporate powers, and if, as the Court assumed the act allowing the recovery of all except the excess over legal interest on a usurious contract was repealed when the case arose, it has no possible bearing on the other point under discussion.

In the course of the argument two other cases have been pressed upon us, to-wit: *The Bank of the United States* v. *Owens*, 2 Peters, 527; *Bank of Chillicothe* v. *Swayne*, 8 Ohio, 252. In the case of the *Rock River Bank* v. *Sherwood*, 10 Wisconsin, 230, these authorities are ably reviewed, and the reasoning of the opinion upon the point now in judgment is so satisfactory that we will be excused for quoting from it at large. After stating the admitted doctrine that the contract of a corporation forbidden by its charter, or entirely foreign to the purpose and objects of its creation, or beyond the scope of the authority granted in its charter, is void, and illustrating it by numerous examples, the opinion proceeds as follows: Does the present case fall within

that class of decisions? Here the bank, it is concluded, had full and ample power to discount promissory notes, loan money, etc., and conduct a general banking business, but it could only reserve ten per cent. interest upon its loans. It is not a case where a corporation usurps a power not given by its charter, but when in the exercise of a lawful power and in conducting its legitimate business it has exceeded the limits fixed by law. Had the note been given drawing ten per cent. interest after it became due, there could have been no question as to the validity of the contract. But the objection is, that the bank had no authority to discount a note at a greater rate of interest than the general banking law allowed; and if it does, the note is void for want of such power. Is this objection sound? I think not. And yet it must be admitted that there are a number of cases which appear to sustain this position. *The Bank of the United States* v. *Owens*, 2 Peters, 527; *Bank of Chillicothe* v. *Swayne*, 8 Ohio, 252; *Creed* v. *The Commercial Bank of Cincinnati*, 11 *Ib.*, 489; *Spaulding* v. *The Bank of Muskingum*, 12 *Ib.*, 544; *Orr* v. *Lacey*, 2 Doug., 230, are cases where this question as to the effect of a bank discounting a note at a greater rate of interest than is allowed by its charter is discussed, and some of them hold distinctly that the contract is void, for want of capacity in the bank to make it.

I am not prepared to follow these decisions. In my judgment the reasoning of these cases is clearly, successfully and completely answered by the opinions

given in the *Commercial Bank of Manchester* v. *Nolan et al.*, 7 How. Miss., 508, and *McLean, Assignee, etc., of Manard*, v. *The Lafayette Bank* et al., 3 McLean, 587. Mr. Justice Clayton gave an exceedingly able and elaborate opinion in the first case, in which the case in 2 Pet. is carefully examined and reviewed, while the doctrine of the Ohio cases is vigorously assailed, and to my mind completely overthrown. In the case in the 3d McLean, Mr. Justice McLean, in considering the effect upon the contract of a bank taking usury, and meeting the objection that such a contract was void for want of power of the bank to make it, uses the following language (p. 611): "Now here is a capacity imparted to do every thing which a natural person could do in relation to the business specified. The natural persons who compose the corporation are authorized to do, in their aggregate capacity, what each one might do in his natural capacity. Now, what is the difference between the natural and artificial capacities here spoken of? It is admitted that an artificial person has no power to violate the law of its creation, or any other law. Has a natural person power to violate the law? We suppose not, and in this respect no difference is perceived between the two capacities. It is not a question of capacity, but of prohibition. A natural person is prohibited from taking more than six per centum per annum interest. If it were not for the prohibition he might agree for any reasonable rate of interest. And if

the bank had not been prohibited in like manner, might it not have charged in the same way? Is there any doubt of this? It has power to loan money on interest, and no rate of interest being established by law, may it not contract for the rate of interest as a natural person? If it may not do this, it may do nothing. The prohibition in the charter acts upon the artificial capacity as the general law of the same import acts upon the natural capacity of every citizen."

Again he says, while endeavoring to show that a bank and an individual occupy the same ground as to taking usury: "Neither can have any implied power to make a contract in violation of law; and the argument that a bank can do nothing for the doing of which power is not given, while an individual may do any thing which is not prohibited, is without force, because it can have no application to the case. The act is prohibited alike to the bank and the individual. On what principle, then, can the distinction be sustained? As has been shown, the bank has the same power, under its charter, to make a contract for the loan of money as an individual, and if more than six per centum per annum had not been prohibited, it might have charged more."

In the foregoing opinion reference is made to the able opinion of Mr. Justice Clayton in the case of *The Commercial Bank of Manchester* v. *Nolan,* reviewing both of the cases so much relied upon by the learned counsel of the appellants in this case. We regret

that we are unable to present in its force and fullness the argument of Justice Clayton in support of our views. Part of his reasoning, however, is so applicable to the facts of this case that we can not forbear a quotation: "An Act of incorporation never attempts to embody all the rules and principles which are to govern the institution it creates; of necessity it has reference to the existing laws of the State in which it is passed. Those laws apply. as forcibly to an artificial person at the time of its creation as to a natural person at birth. The one is governed by them except' so far as exempted by its charter, just as the latter is clothed with them at the first moment of existence. A charter containing provisions contrary to the Constitution would be void, precisely as any other legislative act. This shows that the general laws in force at the time of its creation bear upon it, except so far as its charter may take it out of their influence. . . . Indeed, the argument for the defendant in error (plaintiff in error in this case) is founded upon the assumption that this corporation is subject to the general law of the land, for it demands the application of a common law principle to this contract to make it void. The common law can only be in force in this State to the extent that it remains unchanged by statute. The common law rule against usury at the time of the enactment of this bank charter was so far modified that the contract was only avoided as to (the excess of) the interest."

But our purpose is mainly to show by the aid of Mr. Justice Clayton's opinions that the opinion of the Supreme Court in the case of *The Bank of the United States* v. *Owens*, 2 Peters, 527, is clearly distinguishable upon the vital point in the case in hand. It is true, as argued by the appellant's counsel here, that a law did exist in the State of Kentucky where the contract in that case arose similar to ours, in that it avoided a usurious contract only as to excess over the legal rate of interest, but it is certain that the Supreme Court did not rest its judgment at all upon the statute. For the Court expressly say the question here has relation exclusively to the legal effect of a violation of the provision in the charter on the subject of interest, and does not bring in question the operation of the Statute of Usury of Kentucky upon the validity of this contract.

It is true the learned Judge says that it does not appear why the case was decided without reference to the statutes of Kentucky; but his conclusion, which seems satisfactory, is that the Court had frequently decided that the Bank of the United States was governed by the law of Congress alone, and was subject to no other legislation, and as there was no Act of Congress which permitted a recovery of the principal sum but where there had been usury, the case was left to the general common law doctrine; his conclusion was that had there been such an Act of Congress, the decision in that case would have been different, else, as he forcibly asks, why do they so carefully

D. M. Perkins, Plaintiff in Error, *v.* Samuel Watkins, Trustee.

say that they can not consider of the effect of the statute of Kentucky?

The remaining case principally relied upon is *Wetmore* v. *Brien & Bradley*, 3 Head, 723. In reference to this case, we observe that it was decided under a contract made with one of the banks, organized under what is known as the "Free Banking Law" of 1851–2. The prohibition against usury in that law, and the amendment of 1856, is made under severe penalties. Persons exercising the privilege of banking under said Act, "shall not be authorized to discount or shave notes, directly or indirectly, at a greater discount than the other banks are allowed, under existing laws; and a violation of this section shall forfeit all rights of banking under this Act;" and the persons so offending are also "declared guilty of a misdemeanor, and on conviction, shall be fined in a sum not less than fifty, nor more than five hundred dollars for each and every offence."

When contracts are prohibited by statute, the prohibition is sometimes expressed, and at others implied. Wherever the law imposes a penalty for making a contract, it impliedly forbids parties from making such a contract, and when a contract is prohibited, whether expressly or by implication, it is illegal, and can not be enforced. Of this there is no doubt. *Bensley* v. *Bignold*, 5 B. & A. L. D., 335; *Foster* v. *Taylor*, Ibid., 887; *Cope* v. *Rowlands*, 2 M. & W., 149.

This principle was applied in the case of *Wetmore*

v. *Brien & Bradley,* and as we understand the case, it was by reason of the existence of this penalty that the Court concluded that the violation of the Act of 1845-6 was not to be construed in *pari materia* with the general usury laws. Much stress was also laid upon the fact that the "Free Banks" had notoriously departed from the legitimate business of banking allowed them by their charters, and were converted into establishments for oppressing the community by usury and extortion. It is obvious that this decision is not in conflict with the conclusion at which we have arrived—that when the bank charter is silent as to the consequences of violating the limitations imposed on it in the lending of money—we must apply to it the general law against taking unlawful interest on money.

We do not assent to the argument of counsel, that if Perkins was an accommodation indorser, the discount by his principals of the bill at a greater rate of discount than six per cent., would be such a fraud upon him as would discharge him from all liability upon the bill. We further think that the question of payment was fairly submitted to the jury, under proper instructions, and after a most careful consideration of the case, we find no error in the record, and the judgment is affirmed.