Buckley *v.* Buckley.

JOHN L. BUCKLEY *vs.* SARAH M. BUCKLEY, MOWRY and others.

All the erections connected with a cotton factory, and other mills propelled by water-power, including the dams, water wheels, and gearing, and machinery fastened to the ground or buildings, are *prima facie* a part of the realty, and descend to the heir at law of the owner, upon his death, and do not pass to his executors or administrators as a part of his personal estate.

They will also pass to the remainderman, as between him and the tenant for life.

Real property, purchased for partnership purposes, with partnership funds, and which remains after paying the debts of the firm, and adjusting the equitable claims of the different members of the firm, as between themselves, is considered and treated as real estate.

The grantee or vendee of a tenant by the curtesy has all the rights of a tenant for life ; and in respect to erections placed upon the premises by him for the purposes of trade, the question is substantially between a tenant for life and the remainderman.

The seisin of one tenant in common is the seisin of the others. Accordingly, where a person, in right of his wife, became a partner with others in the ownership of a cotton factory and other mills, and in the management of the business thereof, and received a proportionate share of the profits from the time his wife became interested in the property, until after her death ; *held,* that this was a sufficient seisin of the wife to consummate the estate by the curtesy in the husband.

The rule in this state, as between grantor and grantee, vendor and vendee, mortgagor and mortgagee, and heir and personal representative of the deceased, is that whatever is annexed or affixed to the freehold, by being let into the soil or annexed to it, or to some erection upon it, to be habitually used there, particularly if for the purpose of enjoying the realty, or some profit therefrom, is a part of the freehold.

Where a devisee is the heir of the testator, he will take by descent, and not as purchaser, unless a different estate is given him, or there is a conversion; even if there is a charge upon the realty.

Where a testator directs that all his just debts and funeral expenses shall be paid by his executors, the charge is confined to property given to the executors. And if there is a devise of land to them, such land is chargeable with debts, unless otherwise specifically and entirely appropriated by the will.

Where a testator, by the residuary clause of his will, gives all the rest and residue of his estate and effects, real and personal, not therein otherwise effectually disposed of, after payment of his debts, legacies, funeral expenses, and other charges therein authorized, to his daughter, this creates a charge upon the *residuum,* in case there is a deficiency of personal property.

A charge merely, does not alter the rights of the parties to the realty, until enforced. Nor does a devise of lands in trust to sell and pay debts and legacies, if the devisee can not receive the rents and profits. Much less does a mere power to sell.

In Equity. The bill in this cause was filed in December, 1847, and prayed that the copartnership of Wm. Mowry & Co.

Buckley *v.* Buckley.

might be declared dissolved; an account taken of the assets thereof; the respective rights of the parties to the suit be ascertained and settled; and that the property might be divided or sold, the proper persons joining in the conveyance, and the proceeds divided according to their respective interests.   In 1806, Wm. Mowry and Wm. Casey owned three-fourths of a cotton factory and other buildings in Greenwich, Washington county, N. Y. on the Battenkill.   In 1807 they purchased of one Pettys over 14 acres lying on the Battenkill, in Greenwich and Easton. Upon this they built a cotton factory, and carried it on under the style and firm of "Wm. Mowry & Co."   In 1808 Mowry & Casey conveyed one-third of all their interest in the property and concern to John Gale, and took him in as an equal partner. In January, 1812, Casey's interest was sold upon an execution, and bid off by John D. Dickinson.   In March of that year Mowry & Gale released to D. all claim upon Casey's part of the property and admitted D. as a member of the firm.   In August, 1812, D. by a deed and by assignment, transferred all his interest to Townsend McCoun, who was also thereupon admitted as a member of the firm.   In December, 1812, Mowry conveyed a moiety of his interest in all the property, real and personal, to Samuel McCoun.   In February, 1820, Whipple and others conveyed to said parties the remaining one-fourth of the land owned by Mowry & Casey in 1806.   They also released all right to the 14 acres purchased of Pettys.   This conveyance, and the release, were to Mowry, one-sixth; Gale, one-third; T. McCoun, one-third; and S. McCoun, one-sixth.   The release recited that a dam across the Battenkill was mostly in the 14 acres, and valuable improvements had been made since Pettys conveyed it, by erecting a factory and other machinery on this parcel.   And that disputes had arisen about the use of the water, &c. and that the releasees, naming them, "under the firm Wm. Mowry & Co. claimed to be seised of an absolute, indefeasible estate of inheritance in fee simple of and in the said premises, with the appurtenances, and of and in the privilege of draining water from said pond for any and every use and purpose they may deem proper, either for manufacturing, milling or otherwise, in the

following proportions, viz. Wm. Mowry, one-sixth; John Gale, one-third; Townsend McCoun, one-third, and Samuel McCoun, one-sixth." In September, 1822, Samuel Gale purchased John Gale's part at a marshal's sale, on an execution against John. January 1st, 1825, Bethel Mather conveyed to W. Mowry, one-sixth, to T. McCoun one-third, to S. McCoun one-sixth, to Samuel Gale one-third of over 3 acres of land on which were a grist mill, saw mill and carding machine, with all the tools, utensils and machinery used about the same, and certain water power; by 4 separate deeds, one to each.

On the 29th day of January, 1825, the two McCouns, S. Gale and W. Mowry entered into a stipulation or agreement under seal, in which they recited the fact of the last purchase, and that they had received deeds of their respective shares and proportions, to which and other papers reference was made, and then added as follows : "Now therefore to the end that the objects and intentions of the parties may more fully now and hereafter be understood, we hereby mutually and severally covenant and agree with each other, for ourselves, our heirs, executors, administrators and assigns, that we will hold the aforesaid late purchased lands, mills, water privileges and appurtenances, and also the buildings, water privileges and lands called the old cotton factory, situate on the land so lately purchased, but heretofore and now owned by us jointly in common for the use, benefit, interest and accommodation of our said cotton manufacturing property and works; and it is agreed that we give no preference of water privileges to said mill property or cotton factory, both works being on one dam, are equal as to water privileges, and that we will not individually or severally use, let or lease, sell or convey our share or interest in the said late purchased premises and privileges separate and unconnected with our respective shares and interest in said cotton manufacturing property and interest. Nothing herein contained is meant or intended to hinder or prohibit the said proprietors, or either of them, from selling or conveying the whole or any part of their joint shares of said cotton manufacturing property and

said last purchased mill property, joint and connected, but not otherwise."

On the 18th of November, 1825, Wm. Mowry conveyed five-sixths of another parcel of land, containing between two and three acres, adjoining the parcel of 14 acres, to T. McCoun two-sixths, to S. Gale two-sixths, and to S. McCoun one-sixth. On the 25th March, 1830, Samuel McCoun died, leaving his share of this property to his son John T. McCoun. May 4th, 1830, Samuel Gale conveyed his interest to John Gale. On the 23d of December, 1834, John T. McCoun conveyed his interest to Wm. H. Mowry and Henry Holmes by two deeds.

On the 21st September, 1834, Townsend McCoun died, leaving a widow and one child, Mrs. Phebe Buckley, who was his sole heir at law. By his will he directed, first that his debts should be paid by his executors thereinafter <u>made</u>; second, he gave a house and lot to his wife during life, also his furniture to his wife, also an annuity of $1500, which he expressly charged upon certain lands and tenements which he specified as thereinafter devised in trust to his executors and in lieu of dower; third, he gave certain real estate to his daughter in fee. Also other real estate for life, remainder to her children living at his death. Also after the death of his wife, an annuity of $750 during life to her sole and separate use, and made this a charge upon his real estate devised in trust to his executors; fourth, he devised to his executors by name, not including his wife, several parcels of real estate and certain bank stock, subject to and charged with the payment of said annuities to his wife and daughter, and in trust to pay the same and to invest the balance to accumulate, &c. for the children of his daughter, and to make an equitable division to be paid as they became of age, &c. and any portion of real estate set off to a child, to be liable for a fair proportion of the annuities, &c. with power to sell in the discretion of the trustees, subject to the annuities, &c.; fifth, he devised his lot and store in Troy, to his grand-sons, sons of his daughter, born and to be born; sixth, he disposed of a farm in Orange county, the use to D. so long as she occupied it, with remainder to his daughter in fee; seventh,

he gave certain legacies to the children of Samuel McCoun; eighth, a legacy, to his sister, payable in one year after his death. And the ninth clause of the will was as follows: "All the rest and residue of my estate and effects, real and personal, not herein before otherwise effectually disposed of, (after payment of my debts and legacies, funeral expenses and other charges herein authorized,) I do give, devise and bequeath unto my said daughter, Phebe Buckley, her heirs and assigns forever." Tenth, he made his wife and four others, his executrix and executors. The daughter, Phebe Buckley, died March 15, 1838, leaving six children made defendants in this cause, all then being under age but one. Phinehas H. Buckley, her husband, took out letters of administration upon her estate. After the death of Townsend McCoun, Phinehas H. Buckley became a member of the firm of Mowry & Co. and so continued until the 12th day of August, 1845, when he conveyed all his interest in all this property and his interest in the copartnership, to the plaintiff John L. Buckley, his brother, for the consideration expressed in the deed of $10,000. It appeared that Phinehas had become insolvent, and that his indebtedness to the plaintiff, which was the consideration of the conveyance, was pre-existing. Wm. Mowry died in March, 1845, and devised all his "right, being an undivided sixth part of all the estate real and personal, stock in trade and debts due, of, in and to the firm of Wm. Mowry & Co. called the Washington Cotton Factory," &c. to his daughter Caroline Holmes, who was the wife of the defendant Henry Holmes. John Gale died in September, 1846, leaving a wife and five children. He left a will of which the following is a copy.

"In the name of God, Amen. I John Gale, of the town of Greenwich, in the county of Washington and state of New-York, being of sound mind and memory, do make and publish this my last will and testament in manner following, viz. I order and direct my just debts and funeral charges to be paid. I give and devise to my beloved wife Remember Mary Gale, the use and enjoyment and the rents and profits of my homestead farm, unless it should be deemed advisable by my executors and for the

Buckley *v.* Buckley.

benefit of the estate as well as for her interest to sell it, and in that case I authorize my executors to sell and convey the same and invest the same proceeds at interest, either in bonds and mortgages or public stocks of this state or the United States, the interest to be paid annually to my wife during her life. She is to have the use of all the household furniture, and at her decease to be equally divided between my four daughters or their heirs. I also direct my executors, after my debts are all paid, to pay my wife from dividends made from the cotton factory, if made to that amount, two hundred dollars annually. And I further direct that my wife shall be furnished with the breadstuff she may require for family use from my mill in Easton, and this be considered a lien on said mill. I further direct, (should) my wife require further support, the executors to pay her the one half of what may be considered a fair rent of my brick store in the mill lot, which building I own independent of the original joint purchase.

I direct my executors to pay William Gale and Sarah D. Gale one thousand dollars each, and Caroline M. Townsend three hundred, she having received up to April 9th, 1840, seven hundred dollars ; all sums since received, if any, to be deducted. My daughter Elizabeth has already received one thousand. The executors are directed to pay Juliana Gale, Sarah D. Gale and Caroline M. Townsend the sums thus above directed to be paid to them from the first moneys collected after paying all my debts. In the mean time they must be furnished with such aid as may be necessary to render them comfortable until the various sums can be raised to pay the full amount as directed. I direct my executors, as soon as my debts are all paid and any portion of my real estate can be sold without sacrifice, to pay over to each of my four daughters, Elizabeth, Juliana, Caroline M. and Sarah D., two thousand dollars. The executors are directed to invest the several sums of two thousand dollars each either in stock of the United States or of the state of New-York, or on bond and mortgage or valuable real estate, the interest to be paid over to each one annually ; and at the decease of either of the daughters without heirs, the interest in the sums thus bequeathed to be

equally divided between the survivors or their heirs. Elizabeth is to receive the interest during her life, and the principal to be equally divided between her children at her decease. I give and bequeath to my son Frederick A. Gale, my equal undivided half part of the mills, buildings and land, with all water privileges appertaining thereto, on the east side of Battenkill in the town of Easton, upon conditions, viz.: the said F. A. Gale is to take possession of the above described premises, to superintend and manage the same prudently, and the net revenue arising therefrom, or from any portion of my real and personal estate, shall be appropriated to the extinguishment of the debts due from my estate at the time of my decease. When the debts are all paid F. A. Gale is to come into immediate possession of the mill property as above described. The brick building now occupied as a store is owned by me independent of the original purchase of the mill lot which I also include in the devise to the said F. A. Gale, subject to the conditions following, viz. should any circumstances occur which would render it necessary that either my wife or daughter should receive aid, through misfortune or untoward causes, such a portion of the rent shall be paid as directed in my second section of this will. 6th. When the debts are all paid or arranged, with the legacies, I direct that my step-son Amander B. Sherman, one of my executors, shall be paid out of my estate four hundred dollars, in addition to the payment of a certain note given him some years past for six hundred dollars; and while he remains unmarried he may board in the family, free from expense. My property consists mostly in real estate. My directions and advice to my executors are to exercise sound discretion in the management; to sell such portions, when fair prices can be obtained, but not suffer yourselves to be driven into a sale of any part to disadvantage by any of the heirs, but at the same time they must be assisted to an equal share of any surplus revenue until a final close can be made and the devises are all paid on a final settlement. Should there be a deficit to meet all the bequests, an equal deduction is to be made from each. I do hereby nominate and appoint my step-son Amander B. Sherman, with my son Frederick A. Gale

and Ezra Thompson Gale, executors of this my last will and testament; and I hereby expressly revoke all and every former wills by me made. In case of the absence or refusal to serve of either of my executors, I hereby authorize the remaining executor or executors to execute any of the powers conferred by this will."

The plaintiff claimed as assignee of purchaser from Phinehas H. Buckley.

At the time of filing the bill, four parcels of this property, a wagon shop, pail factory, blacksmith's shop, dry house, and another parcel, had been leased for years, under which leases the occupants then held. The cotton factory, weaver's shop, grist mill and saw mill, &c. were not leased.

The answers of the children of Phebe Buckley admitted that Phinehas Buckley entered into possession of the property as a member of the firm, and acted as such and received dividends, but that he avowed he was a tenant for life only.

It appeared by some of the annual settlements given in evidence, that the purchase money paid for the lands conveyed by Mather and wife was paid from the profits of the firm, $2000 in 1825, nearly $3000 in 1826, more than $2500 in 1827—the principal being about 7000 dollars. A grist mill was built or generally repaired in 1827. In 1830 the company purchased about $400 worth of machinery. In 1831 and 1832 they expended nearly $9000 for mills, and over $1000 in repairing dam, &c. and received over $4500 from insurance companies. The difference was paid out of partnership funds. In 1833 they purchased one house and built another at an expense of $600, and also purchased and repaired machinery, and the total expense that year was over $1500, paid by the company. During the time Phinehas H. Buckley was a partner, they expended for machinery and repairs about $14,000, of which the machinery was the greater part, and about $2500 in building—and among other erections a wagon shop. The saw mill was rebuilt about 1839. The earnings during the same period were over $20,000. The expenditures for the repairs, &c. since the plaintiff had been a partner were not given, except for the year ending April, 1846;

the repairs, new machinery and building being nearly $1400 that year, and the net earnings nearly $6,500. The bill was taken as confessed against all the defendants, except the children of Mrs. Phebe Buckley.

*T. C. T. Buckley*, for the plaintiff.

· *Walter Rutherford*, for the heirs of Mrs. Buckley.

HAND, J. Several important questions have been argued in this case. It is contended on the part of the plaintiff that most of this property, from its very nature, is personalty, and that were it otherwise, it must all be so considered, in equity, because there is an equitable conversion.

What shall be considered fixtures and as such pass with the realty, is often a vexed question, and is not always easy of determination. Different rules prevail under different circumstances, depending upon the relation of the parties and the nature and use of the property. One rule obtains between heir and executor, vendor and vendee, mortgagor and mortgagee; another between landlord and tenant, and that again is affected by the occupation of the tenant, whether it be trade or agriculture. Another between the personal representatives of the tenant for life and the remainderman or reversioner. Indeed as to machinery, the motive power has been deemed worthy of consideration. Hardly any two decisions can be said to be precisely alike; each generally having some distinguishing peculiarity. The application of any common principle is therefore very difficult. The old law favored the realty; but that has been much relaxed in favor of trade.

Our revised statutes declare that things annexed to the freehold, or to any building for the purpose of trade or manufactures, and not fixed into the wall of a house so as to be essential to its support, shall be deemed assets; and go to the executor or administrator, to be applied and distributed as part of the personal estate of the testator or intestate. (2 *R. S.* 82, § 6, *subd.* 4.) "Things annexed to the freehold, or to any building, shall not

go to the executor, but shall descend with the freehold to the heirs or devisees, except such fixtures as are mentioned". in the above clause. (2 *R. S.* 83, § 7.) And by section 9 "the right of an heir to any property not enumerated in the preceding 6th section, which by the common law would descend to him, shall not be impaired by the general terms of that section." The 6th section has nine subdivisions. The above extract from it is the fourth, and the other eight make very little if any change in the law. If there is any meaning in the 8th section, I think it is intended to confine the 6th to a strict construction. The revisers reported ten subdivisions, two of which referred to fixtures, and in the remarks accompanying this section it might be supposed that they proposed, in all cases of trade fixtures, to put the executor on a footing with a tenant during his term. (*Rev. Notes, 3 R. S.* 639, *2d ed.*) And the chancellor seems to have supposed this was their intention. (10 *Paige,* 163.) The legislature struck out one of the subdivisions, being that part not relating to fixtures for the purposes of trade and manufacture, which latter they passed as reported by the revisers. But whatever might have been the intention of the revisers, the question is, what is the true construction of the statute? The 6th section appears to be a mere enumeration; and if its 4th subdivision is to be construed upon the rule of *nascitur a sociis,* there would be no difficulty, for the other subdivisions are a mere enumeration of personal effects.

It may be proper to remark that so much of this property as was purely personal, on the death of Townsend McCoun, would go to his executors, and not specifically to the residuary legatee. They alone had the title in law. (4 *Bac. Abr.* 444. *Jenkins* v. *Freyer,* 4 *Paige,* 47. *Wodin* v. *Bagley,* 13 *Wend.* 453. *Beecher* v. *Crouse,* 19 *Id.* 306. *Edgerton's Adm'rs* v. *Concklin,* 25 *Id.* 236. 2 *R. S.* 81, § 60.) But our statute, after payment of debts, &c. permits the distributees to take the remaining personalty by order of the surrogate. (2 *R. S.* 95, § 72.) And if that were necessary in this case, after the long possession by the Buckleys, perhaps that might be presumed. In that case of course it would go to the husband of the residuary

legatee, absolutely. Formerly whatever was affixed to the realty undoubtedly by the mere act of annexation, immediately became parcel of the freehold itself. *Quicquid plantatur solo, solo cedit.* (*Lee* v. *Risdin,* 7 *Taunt.* 190. *Herlakenden's case,* 4 *Co.* 63.) Amos & Ferrard, in their treatise on the *Law of Fixtures,* say, that in order to constitute a fixture, it is necessary that the article should be let into the land, or united to it, or to substances previously united therewith. (*Law of Fix.* 2.) This was sufficient to make it realty, within the old rule. And every case of a right to sever a fixture from the freehold is an exception. (*Id.* 9.) But exceptions began to obtain at least nearly 350 years ago, in favor of trade. In a case in. the year book, 20 Hen. 7, 13, a·lessee for years was allowed to remove a frame fixed to the freehold by mortar and annexed to the wall by him for the purpose of his trade. (*Law of Fix.* 18.) The same principle was recognized in *Poole's case,* which was a suit by a lessee for years, against a sheriff for removing the vats, &c. of a soap boiler, his under-tenant. This was decided about 150 years since. (1 *Salk.* 368. *S. C. Holt,* 65.) It has been decided that fixtures that may be removed by the tenant, may be taken on a fi. fa. (*Id.* *Pitt* v. *Shaw,* 4 *B. & A.* 206. *Law of Fix.* 261. 2 *M. & W.* 459.) But not if affixed to the freehold of the debtor. (*Winne* v. *Ingilby,* 5 *B. & Ald.* 625.) Nor can they be recovered in trover until severed; for until severed they are parcel of the freehold. (*MacIntosh* v. *Trotter,* 3 *M. & Welsb.* 184. *Lee* v. *Risden,* 7 *Taunt.* 188.) In *Ex parte Quincy,* (1 *Atk.* 477,) Ld. Hardwicke is made to say that the utensils did not pass on the sale of a brew house unless a consideration was paid or a value set upon them. Utensils is used here, probably, in its limited sense. And that case was between one claiming under the vendee (or his mortgagee) the utensils of a brew house, who had a lease of it, and a subsequent mortgagee of the brew house. The lord chancellor, in relation to the right of fixtures remarks, as between heir and executor, "the freehold descending on the heir, the executor can not enter to take away fixtures without being a trespasser."

*Lawton* v. *Lawton* was a question between the executor of a

tenant for life and the remainderman, as to the right to a fire engine set up by the tenant for the benefit of a colliery, and was decided in favor of the executor. (3 *Atk.* 13.) The claim was prosecuted by a creditor of the tenant, who introduced proof of the custom to remove them, and that they were constructed and enclosed with reference to such removal. And Lord Hardwicke said it did not appear in evidence that in its nature it was a personal movable chattel, taken either in part or in gross before it was put up. He adverts to the rule, but says it has been re-laxed, but chiefly between landlord and tenant, between whom the case would be very clear, and not so frequently between ancestor and heir at law or tenant for life and remainderman. He added that it was not a case between ancestor and heir, but an intermediate case between a tenant for life and a remainderman; which he thought came nearer the case of a common tenant. He finally decided in favor of the executor, principally to encourage trade, for public benefit. He further said the court would construe the fund assets, to the utmost in favor of creditors. Some of the strongest cases of severance were in favor of creditors. (*Lawton* v. *Lawton, supra. Law of Fixt.* 261. *Farrar* v. *Chauffetete,* 5 *Den.* 527. *Pitt* v. *Shaw, supra. Raymond* v. *White,* 7 *Cowen,* 319. *Sturges* v. *Warren,* 11 *Vt. Rep.* 433.) Yet Richardson, J. in *Steward* v. *Lombe,* thought a wind mill could not be taken in execution. (1 *B. & B.* 506.) In a note to the case of *Lawton* v. *Lawton,* it appears that certain other engines fixed upon salt works by the father of the tenant for life were decreed not to be personal estate of the testator. This case was decided in 1745.

About forty years after this, *Lawton* v. *Salmon* was decided. (1 *H. Black.* 259, *note. S. C.* 3 *Atk.* 16, *n.*) This was trover in the King's Bench, by an executor against the tenant of the heir, for salt pans used in salt works, and placed there by the testator, who was seised in fee. They might be removed without injuring the buildings, and were not joined to the walls, but were fixed with mortar to the brick floor, with furnaces under them, and the workmen could walk around them within the building. They could be removed without injuring the building. Ld. Mansfield

Buckley *v.* Buckley.

gave the opinion of the court, that the salt pans belonged to the heir. As between heir and executor he could find no case except that of the cider mill, (before Ld. C. B. Comyns, which he seems to doubt,) of a relaxation of the rule. He rather admitted that the case of a tenant for life and remainderman was more analogous to that of landlord and tenant. And so Ld. Ellenborough intimates in *Elwes* v. *Maw*, (3 *East*, 51.) This decision in *Lawton* v. *Salmon* removes the doubt thrown over the rights of the heir by an obiter remark of Ld.' Hardwicke in *Lawton* v. *Lawton*, and accords with what he said in relation to those rights in *Ex parte Quincy*, (*supra*,) and in *Dudley* v. *Wade*, (*Amb.* 113.) It should be remarked that *Dudley* v. *Wade*, like *Lawton* v. *Lawton*, was also a claim by the executor of a tenant for life or in tail. So the question between heir and executor, as in *Lawton* v. *Salmon*, did not arise. And Ld. Ellenborough, as late as 1802, in *Elwes* v. *Maw*, after stating that questions in respect to fixtures ordinarily arise between three descriptions of persons, says, " as between heir and executor the rule obtains with the most rigor in favor of the inheritance and against the right to disannex therefrom, and to consider as personal any thing which has been affixed thereto." He adds, that between the executors of a tenant for life or in tail and the remainderman or reversioner, the right to fixtures is considered more favorable for executors than in the preceding case between heir and executor. After speaking of the relaxation between landlord and tenant, &c. he says, " the general rule on this subject, is that which obtains in the first mentioned case, i. e. between heir and executor ; and that rule [as found in authorities which he names] is that where a lessee having annexed any thing to the freehold during his term, afterwards take it away, it is waste." The better opinion seems to be that the case of the cider mill before Ld. Ch. Baron Comyns rested upon custom. (*Note to Lawton* v. *Lawton*, 3 *Atk.* 14. *Lawton* v. *Salmon*, *supra.* *Law of Fix.* 144. And usage controlled the case of *Culling* v. *Tatnall*, (*Bull. N. P.* 14. *Law of Fix.* 40.) And in *Wansboro* v. *Maton* a custom was shown to remove such barns ; and beside, in that case the court decided that it was not

attached to the freehold in any way.    (4 *A. & E.* 884.)    And so in *Rex* v. *Otly*, the case of the wind mill, (1 *B. & Ad.* 161.)

I do not find any relaxation of the rule between heir and executor, in this state.    (*Hermance* v. *Vernoy* went off on another point.  (6 *John.* 5.)    So did *Cresson* v. *Stout*, (17 *John.* 116.) In that case there was a plain answer to the defense, without reference to the question of fixtures.    And had there not been, the mortgage by the owner conveyed every thing to the plaintiffs except the frames for spinning flax, and those were not fastened to the floor or walls.    And besides, Mr. J. Platt puts his opinion upon the authorities cited in *Elwes* v. *Maw*.    No reference is made by him to the distinction between the rights of owner in fee and a tenant.    *Holmes* v. *Tremper*, (20 *John.* 29,) was between landlord and tenant for years.    No reference was made to the fact that the case of the cider mill, and others, were supposed to have turned upon usage.    But there, the rule between heir and executor was recognized.    *Miller* v. *Plumb*, (6 *Cowen*, 665, *in* 1827,) was trover by a vendor of the premises on which an ashery stood, for kettles, troughs and leaches, and 500 feet of boards, belonging to the ashery.    Two potash kettles were set in an arch of mason work with a chimney; the arches on a platform, but not fastened to the building.    The troughs were sunk in the ground.    The boards were for an upper floor, and part of the kettles were not set in any way.    The lessee of the grantee had taken possession.    The plaintiff recovered, and the defendant, on a writ of error, reversed the judgment.    Woodworth, J. in delivering the opinion of the court said, "the rule appear to be well established: whatever is affixed to the freehold becomes part of it and can not be removed.    Exceptions have been admitted between landlord and tenant; between tenant for life or in tail and the reversioner; yet the rule holds between heir and executor."    And he approves the remark of Lord Ellenborough in *Elwes* v. *Maw*, that "the rule obtains with the utmost rigor in favor of the inheritance and against the right to disannex therefrom and to consider as a personal chattel any thing which has been affixed thereto:" and said that the cases of heir and executor, and vendor and vendee, were different

from those of tenant for life and reversioner, and landlord and tenant. " The ancestor or vendor has the absolute control, not only of the land, but of the improvements. The heir and executor are both representatives of the ancestor ; the vendor has an election to sell or not to sell the inheritance." He also repeated Lord Mansfield's remark in *Lawton* v. *Salmon, (supra,)* that " I can not find that between heir and executor there has been any relaxation of this sort, except in the case of the cider mill, which is not printed at large." He however thought there had been a conversion of some of the articles which were not annexed to the freehold. I suppose these were the kettles not set in any way, and the boards.

In *Walker* v. *Sherman,* Mr. J. Cowen took an elaborate view of most of the leading cases. (20 *Wend.* 658.) Had that been a case of heir and executor I should have thought it unnecessary to re-examine the question. It was a case of partition between tenants in common, who Judge Cowen thought stood upon the same ground as grantor and grantee, where we have seen the principle between heir and executor before our statute, prevailed. The property was a woolen factory, a house, barn and 20 acres of land. In making partition the court treated two double carding machines, a picking machine, spinning machine, looms, &c. as personal property. On the hearing before the commissioners the plaintiff's counsel admitted that all the machinery affixed to the freehold was real estate, but denied that machinery which was loose and movable was so. The articles in question, as stated by the plaintiff's counsel, were in the factory, but not in any manner affixed or fastened to the buildings or lands. The commissioners acted upon this distinction. Judge Cowen thought from the affidavits that the machinery treated as personalty by the commissioners " was such only as was movable and in no way physically attached to the factory or land, though it had been used for several years as belonging to the factory, and was material to its performance in certain departments of its work, as the machinery which was actually affixed. Did the commissioners err in disregarding the movable machine ?" The court held they did not. In this case, then it was said, that whatever

Buckley *v.* Buckley.

was affixed to the freehold was real estate, and that part of the machinery which was "in no way physically attached to the factory or land," was not. And that by a deed "conveying the freehold, whether by metes and bounds of a plantation, farm or lot &c., or in terms denoting a mill or factory, nothing of a nature personal in itself will pass, unless it be brought within the denomination of a fixture by being in some way permanently, at least habitually, attached to the land or some building upon it. It need not be constantly fastened. It need not be so fixed, that detaching will disturb the earth or rend any part of the building. I am not prepared to deny that a machine movable in itself, would become a fixture from being connected in its operation by bands, or in any other way, with the permanent machinery, though it might be detached and restored to its ordinary place, as easily as the chain in *Farrar* v. *Stackpole.* I think it would be a fixture notwithstanding." And again; "It is not to be denied that there are strong *dicta,* and perhaps we may add the principle of several adjudicated exceptions, upon which we might with great plausibility declare the machines in question so essential to the purposes of the manufactory, although entirely dissociated with the freehold, a fit subject for entering into the list of constructive fixtures. The general importance of the rule, however, which goes upon corporeal annexation, is so great, that more evil will result from frittering it away by exceptions, than can arise from the hardship of adhering to it in particular cases." In this opinion he suggests that, as between heir and executor the revised statutes may have partially altered the rule. And he adds, "taken literally, it would strip the heir of the wheels, gearing, and all the other machinery fixed in the ordinary way to a mill or manufactory inherited by heirs." But this point was not argued; the case, as we have seen, being between tenants in common. This decision was in 1839; and in 1843, Chancellor Walworth decided *House* v. *House,* where this statute came directly under examination. (10 *Paige,* 158.) The decedent died seised of a grist mill and flouring mill; and it was claimed that the machinery and apparatus which was necessary for manufacturing flour in such mill, and which were not fixed

into the wall so as to be essential to its support, was personalty and belonged to the administrators.   The chancellor thought it impossible in three lines to define what was part of the freehold itself and what were mere fixtures or things annexed to the freehold for the purposes of trade or manufacture, and that we must still go back to the common law, and to the decisions of the courts, for the purpose of ascertaining what is a substantial part of the freehold, and what is a mere fixture or thing annexed to the freehold.   That we must also resort to the same sources of information to ascertain what is to be considered a part of the building, and what is in its nature mere personal property, and only annexed to such building temporarily for the purpose of trade and manufacture.   And that it could not have been the intention of the legislature to allow the personal representatives of the owner in fee to strip a grist mill of the water wheels, mill stones, bolting apparatus and running gear, leaving to the heir the mere sides or walls of the building, with its floors, partitions and roof.   He said these fixtures were not only convenient, but essential to the enjoyment of the inheritance ; taking the same ground as Lord Mansfield, in *Lawton* v. *Salmon.*   He decided that the mills and all the apparatus went to the heir; explicitly following the old rule.   (*And see Le Roy* v. *Platt,* 4 *Paige,* 82 ;  2 *Kent,* 346, *and note, 5th ed.*)   In *Cook* v. *The Champlain Trans. Co.* the erections were by tenants.   (1 *Den.* 31.) In the case of *Farrar* v. *Chauffetete,* (5 *Denio,* 627, *in* 1848,) it was held that a horse power and machinery for making pumps on the farm of the owner, the horse power being a horizontal wheel in the basement of a building, which turned on an iron pivot driven into the center of two large sticks of timber crossing each other at right angles and embedded in the ground, and the rest of the machinery fixed in the building partly by timbers embedded in the earth, and partly by being fastened to the frame and floors by bolts, screws, nuts and cleats, and connected with the horse power by belts and gearing, were not fixtures passing with the freehold.   It was found however that it was not affixed to the building, except so as to be detached from it without drawing nails or breaking bolts, pins or other things, and that they

were put up after the building was built, and for manufacturing purposes, and in such a manner as to permit them to be taken out at pleasure, without injuring the building. The farm was sold by the sheriff, and after a conveyance, the sheriff sold this horse power and machinery as personal property on another execution, and the suit was a trial of the validity of these titles. The judge at the circuit told the jury that this was personal property, if it could be removed without drawing nails or injuring the building. Whittlesey, J. delivered the opinion of the court, and seemed to lay much stress on the kind of motive power used ; intimating that had the machine been driven by hydraulic, instead of movable power, the decision would have been different. He also relied upon the statute in relation to assets, as a legislative opinion; and upon the fact that the timbers were embedded in the ground and not fixed to the building ; and that the building was not originally erected for that purpose. The opinion is cautiously expressed, and the case evidently stands upon different and narrower grounds than *Walker* v. *Sherman.* There it was said that it need not be so fixed as to disturb the earth or rend any part of the building. And in *Lawton* v. *Salmon,* and *Miller* v. *Plumb,* the articles rested upon the earth, or upon mason work resting upon the earth. All admit that a rail fence on a farm, though not let into, or in any way fastened to, the land, is part of the realty. (20 *Wend.* 646. 2 *Hill,* 142.)

As between tenant for life and remainderman or reversioner, the rule in favor of the realty is, as we have seen, somewhat relaxed. And I am inclined to think that a tenant for life who erects a fixture for the purposes of trade or manufacture, has an equal right, in respect to their removal, with a tenant for years, (*Law of Fix.* 117,) though the cases have perhaps not generally gone so far. But this only applies to those fixtures put up by the tenant. Thus in the leading case against the remainderman, (*Lawton* v. *Lawton, supra,*) engines in a colliery, put up by the father of the tenant for life, were considered realty. (3 *Atk.* 16. And see the case of *Tarrant* v. *Thompson,* 2 *D. & R.* 1. *S.C.* 5 *B. & Ald.* 826.) In that case, where a windmill and machinery had been leased, Holroyd, J. said, " the machinery was let

together with the mill and was part of the mill. It was part of the inheritance until the demise was made. When the demise took place, it continued part of the inheritance of the landlord, and part of a chattel real in the hands of the tenant in possession." (*And see Miller* v. *Plumb, supra.*)

This review of the cases is sufficient to show what the law was before. And we have seen what construction Chancellor Walworth has put upon our statute. It is difficult to see how any other can be given without doing incalculable mischief. This view of the law does no injury to creditors; for the real, as well as personal, property of the decedent is held liable for all debts. But, if fixing into the wall of a house so as to be necessary to the support of that wall, is the test between heir and executor or administrator, then injury will be done to creditors by depreciation and loss, as well as to heirs. Take the case of a flouring mill erected for the purpose of manufacturing flour; the water wheels, gearing, mill stones and bolts, &c. must all come away, and the mill be substantially rebuilt. If a saw mill, the destruction would be as complete. If a forge, its heavy wheels and massive beams and hammers, anvil and block, touch no walls, and three-fourths of the works must be removed. A rolling mill, with its ponderous machinery, if possible, suffers more. A large portion of the parts removed would be quite valueless elsewhere. The greatest care and prudence, probably, would not prevent a sacrifice of, at least, fifty per cent. Language should be very explicit and imperative, before it receives an interpretation so disastrous in its consequences. Toller, to whom the revisers refer, cites no case that maintains such doctrine. (*Toller*, 199. 11 *Vin.* 167.) That rule was never applicable between the real and personal representatives of the owner in fee. If we read "things annexed to the freehold" for trade, &c. without reference to the remainder of the paragraph, and consider a building as distinct from the freehold, perhaps the administrator may take from the heir, buildings. As between landlord and tenant for years, it has been held the tenant could remove the building itself erected for the purposes of trade. (*Van Ness* v. *Pacard*, 2 *Peters*, 137.) The revisers say, the 8th section was inserted

Buckley v. Buckley.

for greater caution. It saves the right of the heir to property not enumerated in the 6th section, and which would descend to him by the common law, from being impaired by the general terms of that section. This, if it means any thing, limits the section strictly to the enumeration. The 7th, which was not reported by the revisers, taken literally, if we adopt the same dividing line, would give to the heir every thing annexed to the freehold not included in the 4th subdivision, as a mirror, &c. fastened to the wall, (unless adjudged, notwithstanding this phraseology, to be furniture under the 9th subdivision.) And a tenant for years, or for life, or an administrator, could remove nothing in any way annexed to the freehold, or fixed to the wall of a building, unless for trade or manufacture.

It seems to me the legislature never intended these consequences. This fourth subdivision, probably, applies to those cases only, where the interests of the late occupant and the present owner are adverse, or at least distinct; as where the present owner is not the real representative of the decedent. The preceding parts of the section refer to such cases. And the word "things," which has been held to refer to personalty, (*Cook* v. *Oakley*, 1 *P. Wms.* 302,) may here be restrained to articles *ejusdem generis*. Even where the decedent had a lease for years, or an estate for the life of another, or where the lands are devised to an executor for a term of years, to pay debts, it is very proper that all the machinery and fixtures should be set forth in the inventory.

Technically, every thing that has been completely annexed to the freehold by the owner in fee, becomes, *ipso facto*, a part of the freehold itself. And in *Winne* v. *Ingilby*, (*supra*,) and *Miller* v. *Plumb*, (*supra*,) this absolute ownership is fully appreciated. It seems to me that the rule in this state, as between grantor and grantee, vendor and vendee, mortgagor and mortgagee, and heir and personal representative of the deceased, still is, that whatever is annexed or affixed to the freehold, by being let into the soil or annexed to it, or to some erection upon it, to be habitually used there, particularly, if for the purpose of enjoying the realty or some profit therefrom, is a part of the freehold.

In the principal case, then, all the erections, including the dams, water wheels and gearing, and machinery, fastened to the ground or buildings, were *prima facie*, a part of the realty held by the tenants in common in the lifetime of Townsend McCoun, and so remained after his death. Thus far we have treated the case as between executor (or administrator) and heir. But this is a case of a devise of the realty. There is no doubt but that the owner of land may devise the same with all the fixtures as realty. The statute has not deprived him of this right. And where he devises land, upon which are water power and machinery propelled thereby ; at least where the right of no third person intervenes, it is by no means clear, that fixtures will not pass. (*Law of Fix. by Amos & Ferrard*, 189. *And see Lushington* v. *Sewell*, 1 *Sim.* 435.) Emblements would, by the common law. (9 *Vin.* 372. *Ram on Assets*, 190, *and cases there cited.*)

Perhaps our statute has altered this rule ; but devisees are not mentioned in the sixth and eighth sections. The seventh uses language implying that fixtures may *descend* to the devisee, but strictly a devisee takes by purchase. (*Ram on Wills*, 18, 20, 110.) If such is the legal intent of the will, *Walker* v. *Sherman* applies. But I do not think it necessary to rest the case upon that ground.

The plaintiff claims as grantee or vendee of Phinehas H. Buckley, the husband of Phebe Buckley. If this property was real estate, and Phinehas was tenant by the curtesy, he had the same right to the fixtures annexed to the land of his wife, as an ordinary tenant for life. (*Law of Fix.* 126.) A tenant by the curtesy was always liable for waste. (2 *Saund. R.* 252, *n.* 7. 2 *Bl.* 283.) Though tenants for life were not punishable at common law, but were by statute. (1 *Cruise, Dig.* 69. 2 *Bl.* 283.) It has been held that the assignee of a tenant by the curtesy, was not liable. (*Bates* v. *Shrœder*, 13 *John.* 260.) But now the assignee is liable. (2 *R. S.* 334, § 1.) The interest of the plaintiff, as having an estate *pur auter vie*, on his death perhaps under our statute, would become a chattel real. (1 *R. S.* 722, § 6.) But however that may be, if Phinehas H.

Buckley *v.* Buckley.

Buckley possessed this property as tenant by the curtesy, the plaintiff, I think, has all the rights of a tenant for life. (*Law of Fix.* 126.) And of course, as to erections placed upon the premises by the Buckleys for the purposes of trade, the question is substantially between a tenant for life and remainderman.

But admitting this to be realty, it is strenuously urged that there was never such seisin of the wife as is requisite to consummate this estate. This objection I think not well founded. Phinehas H. Buckley became partner and received a proportionate share of the profits, immediately after Townsend McCoun's death ; and until long after the death of his wife. And again, if this was real estate in the hands of the partners, they were tenants in common, and the seisin of one tenant in common will be considered the seisin of the other, for this purpose. (*Clancy on Rights of Married Women,* 181. 7 *Vin.* 150. 2 *Crui. Dig.* 551, 560. *De Grey* v. *Richardson,* 3 *Atk.* 469. *Ellsworth* v. *Cook,* 8 *Paige,* 646.)

At common law a tenant by the curtesy could not have a writ of partition. (*Allnatt on Partition,* 34.) But no such objection now exists, if it ever did in equity. Phinehas H. Buckley, or his grantee, has an estate for life, within the statute. (2 *R. S.* 317, § 1. And see 1 *Story's Eq. Jur.* § 665; *Wotten* v. *Copeland,* 7 *John. Ch.* 140.)

Another ground has been warmly contested in this case. It is said by the plaintiff, that this is partnership property, and consequently should be considered personal estate. In that case, the legal estate would be in the heir or devisee, though equity might treat it as personal. (*Coll. on Part.* § 133, *Perkins' ed. Delmonico* v. *Guillaume,* 2 *Sandf. Ch. R.* 366.)

The authorities in England upon this point are very conflicting. An elaborate examination of them will be found in the recent edition of *Collyer on Partnership* by Mr. Perkins. That writer and Mr. Bissett in his late work on the same subject found it difficult to reconcile the decisions. Mr. Cary hardly pretends to give an opinion ; though he says " opinions, however, preponderate in favor of its being treated as personal estate."

(*Cary on Partnership,* 27.)    In *Lake* v. *Craddock,* (3 *P. Wms.* 158,) before Ld. Ch. King, in 1732, five persons purchased land for £5000 and went on for several years trying to drain it, then Craddock abandoned the concern. The other four continued the work and also purchased other lands. After Craddock died one of the four filed a bill for account and division. The master of the rolls decided that the parties were tenants in common, and against survivorship. He also decided that the defendant, who was son and heir, and executor of Craddock deceased, should pay enough with interest, to make his father's share equal to the others in all the lands, and have an equal share, or in default of such payment, have nothing. The defendant appealed, and the decree was affirmed. In *Thornton* v. *Dixon,* (3 *Bro. C. C.* 199,) three persons owned land in fee and entered into co-partnership as paper makers, and built upon the land. Three years after, they took four others into the firm, for 21 years, and by the deed of copartnership, the three first were to stand seised of the land in trust for the uses of the copartnership, in proportion to their several interests, and in case of a desire by one to sell, the others were first to have notice, so that they might buy. The time limited for the partnership expired, and they still continued business until one died. During the second copartnership they had purchased other lands for the better carrying on of their business. All the lands were used for the purposes of their trade. Thurlow, Ld. Ch. considered the land as realty; but said if there had been an agreement to value. and sell, it would have been considered as personalty of the partnership.

Bell v. *Phyn,* (7 *Ves.* 453,) was decided in 1802, by Sir Wm. Grant. Three persons, merchants and partners, with another, purchased a plantation in New-Granada, and before the death of one of them, had nearly paid for it, out of partnership funds. All the accounts in relation to it were kept in the partnership books. One of the residuary legatees of a deceased partner, filed a bill, and it was held that the plantation was real estate. The master of the rolls said there was no occasion to call for it for any of the purposes of the partnership.

Buckley *v.* Buckley.

*Ripley* v. *Waterworth*, decided the same year by Ld. Eldon, (7 *Ves.* 425,) and *Smith* v. *Smith*, by Ld. Loughborough, (5 *Ves.* 189,) turned upon contract; the deeds evincing an intention of the parties to have the property converted into personal estate.

*Balmain* v. *Shore*, decided in 1804 by Sir Wm. Grant, (9 *Ves.* 500,) also turned upon the articles of copartnership, and the recitals in the conveyances. It was held, that the firm had a right to the use of the property during its existence, and that, subject to this use the property was real estate. The property was purchased after the formation of the copartnership, and was a china and pot manufactory, the firm carrying on the business of potters. This case is hardly in consonance in all respects with *Ripley* v. *Waterworth.*

In *Randall* v. *Randall*, (7 *Sim.* 271,) decided in 1835, the Vice Chancellor, Sir Lancelot Shadwell, reviewed many of the authorities. Two brothers, one a land surveyor, and the other a grocer, became copartners in the business of farming. Soon after, they became partners, also, in the business of making malt; and again soon after that, in the manufacture of biscuit. The malting business continued about 13, and the biscuit making about 20 years. The farming business continued in all nearly thirty-five years, until the death of one of the brothers. When they began, they were tenants in common with others of property partly freehold and partly leasehold, consisting of a house, barn, lands, &c. their father's estate. There the farming and malting business were carried on, and the baking business there and on the separate land of one of them. They began in 1792, and in 1802, bought out one of their co-tenants with partnership funds. In 1803, they purchased and paid for another parcel in the same way, and in 1805, another; all of which were used for their farming and agricultural purposes. In 1808, certain allotments of land were made to them, which they improved with partnership funds, and they were used as the other property. In 1820, they purchased some other lots with partnership funds, which they let to tenants. It was held that these parcels were not personal estate.

*Cookson* v. *Cookson*, was decided by the same judge in 1837,

(8 *Sim.* 529.) In that case Cookson the father, who was a bottle manufacturer, was seised of certain estates in fee. He formed a partnership with Cookson the younger for 24 years, and conveyed to him in fee nearly one-fifth of this real estate. After the partnership had continued about 15 years, the father conveyed another portion to the son, which made him owner in fee of nearly an equal undivided one-third of the whole. The consideration of these conveyances, as expressed, was love and affection. The conveyances also included an equal share of the trade, stock, capital and business of the firm. It was agreed that the hereditaments should be used as a manufactory for carrying on the trade, and should be considered as part of the joint stock of the business. And it was to be had, taken and enjoyed as part of the joint stock in the partnership business. And they did, for themselves and their respective heirs, &c. covenant with each other and their several heirs and executors, &c. "that the freehold hereditaments should at all times thereafter be held and occupied as partnership property, and be considered and treated as part of the joint stock of the partnership trade, according to the several shares and interests of the parties therein." And, if either partner should wish to sell, or if he should die without having bequeathed or assigned to a son or sons, then 20 days' notice should be given to the survivor, of such devise or death, who might purchase the interest of the other at such valuation as they had put to the shares at their last annual account, &c. If not purchased, it might be sold to others, who should be admitted partners. After the partnership had existed 24 years, they continued on about four years longer, as before, without new articles and until the death of the father. During the whole 28 years, they held and used this freehold property for the purposes of their trade alone; and its estimated value was entered in the books and accounts of the firm as part of the joint stock or capital, and was considered and treated, in all respects, as part of it. Over $8000 were expended out of the funds of the partnership, in erecting new buildings, and making other improvements upon the premises. The bill was filed to have the interest of the elder Cookson in the freehold, declared stock in trade of the

partnership, and that the eldest son had no interest as heir, and that the surviving partner had no right of pre-emption, and that the estate be sold, &c.   In the course of the argument, the vice chancellor asked if there was any case where real estate had been declared personal, where the land was not purchased with partnership funds, nor was required to be sold for partnership purposes ?   In delivering his opinion, he considered the clause in relation to pre-emption, as not continuing after the first 24 years.   He laid stress on the fact that it was not suggested, that when the partnership terminated, there was " any necessity for a sale of a particle of the assets for the purpose of paying the partnership debts."   Nor was the property purchased with partnership funds.   He approved of the reasoning of Sir Wm. Grant in *Bell* v. *Phyn*, (*supra*,) and decided there was no conversion.

If these cases declare the law, there has been no conversion in this case.   But there are contrary decisions.   *Ripley* v. *Waterworth*, we have noticed.   It was decided in 1802 by Ld. Eldon ; and turned upon the construction of the deed of partnership, which, it was held, was a conversion of the real estate out and out.   Leigh & Dalzell put the case as one of contract of sale.   (*Leigh & Dal. on Eq. Conv.* 21.)   This case is said, by Mr. Collyer, to have paved the way for the modern doctrine and the leading case of Ld. Eldon favorable to equitable conversion in cases of partnership.   (*Coll. on Part.* 72, *Perk. ed.* § 142.) But he says it was placed upon express agreement, and I think Ld. Eldon expressly put it upon that ground.   There was a right of pre-emption, and one of the partners elected to purchase and did so.   So the agreement to purchase was executed.   The property was both freehold and leasehold; and was conveyed to trustees to the use of such persons as the partners should respectively appoint and, in default of appointment, to the use of the partner and to sell and pay partnership debts and divide or convey, &c.

The same chancellor is said to have gone further in *Townsend* v. *Devaynes*, (1 *Mont. on Part. App.* 96.)   As reported in that work, he decided that real estate consisting in part of

Buckley *v.* Buckley.

paper mills, purchased by paper makers, who were partners, and paid for out of partnership capital, and held for the uses of the partnership, was, on the death of one of the firm, and as between heir and executor, to be considered personal estate.   But Mr. Jacob seems to think there was an agreement between the partners for a conversion of the property. (*See* 1 *Roper on Hus. and Wife*, 346, *n. Jac. ed. and the opinion of the V. Chan. in Randall* v. *Randall, supra.*)   Mr. Bickersteth, in his argument in the case of *Philips* v. *Philips*, says, nothing existed of this case except a brief statement extracted from the pleadings ; that there was no judgment in the case, and it was doubtful whether there was not an agreement, and that Ld. Eldon six years after, in *Crawshay* v. *Maule*, (1 *Swanst.* 521,) treated the point as unsettled.   This last remark it seems, is warranted by the report of *Crawshay* v. *Maule.*

*Fereday* v. *Wightwick* came on before Sir  J. Leach, M. R. in 1829.   (1 *Russ. & My.* 45 ; *S. C.* 1 *Taunt.* 250.)  Six persons took a lease for years of certain mines, for  the purpose of working them in partnership.   One, who had been manager, assigned his shares by way of security for money advanced, and then became bankrupt, greatly indebted to the concern.   The bill was filed by the other persons interested therein ; prayer for sale of partnership property, and to have accounts taken and co-partnership dissolved and that the shares of the bankrupt be applied in payment of the debt to the partnership he had incurred in managing its affairs.   The court so held.   The master of the rolls is reported by Tamlyn to have said : " It is a principle that all property, whether real or personal, is subject to a sale, on a dissolution of the partnership.   This is property acquired by the partnership for the purposes of the concern, and it is subject to all the debts of the partnership property, and to the debts of one partner to the other partners in respect of the partnership." By Russell & Mylne, that " the general principle is, that all property acquired for the purposes of trading concerns, whether it be of a personal or real nature, is to be considered as partnership property, and is to be first applied accordingly in satisfaction of the demands of the partnership."

Buckley *v.* Buckley.

The same judge, in *Philips* v. *Philips*, (1 *My. & K.* 649, 1832,) went a step farther and said, with respect to the question, " whether the freehold and copyhold property purchased with partnership capital, and conveyed to the two partners and their heirs for the purposes of partnership trade, is to be considered as personal estate only for the payment of the partnership debts, or is generally to be considered, to the extent of a moiety, as personal estate of the deceased partner, I confess I have for some years, notwithstanding older authorities, considered it to be settled that all property, whatever might be its nature, purchased with partnership capital for the purposes of partnership trade, continued to be partnership capital, and to have, to every intent, the quality of personal estate; and in the case of *Fereday* v. *Wightwick*, I had no intention to confine the principle to the payment of partnership demands. Ld. Eldon has certainly, upon several occasions, expressed such an opinion; the case of *Townsend* v. *Devaynes*, is a clear decision to that effect; and general convenience requires that this principle should be adhered to." The case was this : John Philips devised his freehold and copyhold estates to his executors for sale and to turn into money, and provided for the distribution of the proceeds. The testator was a brewer and carried on that business in partnership with his relation, John Philips, but there were no articles of copartnership between them. In the course of their business, and after the date of the will, they purchased freehold and copyhold public houses for the purposes of their trade, with partnership moneys. Their uncle had also devised to them other copyhold estates, which they also used in their business. He also devised to them mortgages of other public houses, and the nephews out of the partnership funds purchased the equity of redemption. The history of the case seems not complete in *Mylne & Keene*, but additional facts have been given by Mr. Bisset in his work on partnership. (*Bisset on Part.* 50. *And see Perkins' Coll. on Part.* § 145, *and n.*) As reported by Mylne & Keene, one question was ; whether the interest of the testator in the public houses purchased after the date of the will, by the copartners, was to be considered a part of his general personal estate, or

only personal estate so far as required to discharge the debts and engagements of the trade. The bill was filed by the co-heiresses at law against the executrix and surviving residuary legatees, and the decision was against the plaintiffs. It appears from the corrections of this case by Mr. Bisset, that the public houses devised by the uncle, and the land upon which were the mortgages devised to them by the uncle, and of which they afterwards purchased the equity of redemption with partnership funds, were declared not to be part of the capital and effects of the partnership. (*Bisset on Part.* 50, *n. Perk. Coll. on Part.* 145, *n.*) The court, then, distinguished between the lands purchased with partnership funds, and those not purchased with partnership funds, or only in part. For the equity of redemption was paid for out of the partnership funds, and all was used for partnership purposes.

*Broom* v. *Broom*, (3 *Myl. & Keen*, 443,) was decided by the same judge, ten years after *Philip* v. *Philip*. On the strength of the latter case, as between the heir and administratrix, it was held that real estate, purchased by partners with partnership funds, for partnership uses, was, in equity, personalty. The same judge who decided *Randall* v. *Randall* and *Cookson* v. *Cookson*, decided *Houghton* v. *Houghton*, (11 *Sim.* 491.) Two partners purchased land for the purposes of their trade, and borrowed money to do it, for which they gave a mortgage upon the land. They erected trade buildings on it and paid for them, for insurance, and the interest on the mortgage, with partnership funds ; and one died. The survivor took another partner and they did the same, and finally paid the mortgage out of the partnership property and took a reconveyance of the land to themselves, and the survivor of the first firm died. Held, against the heir of both of the first partners, that the land was personalty.

There are other cases bearing upon this question. (*Smith* v. *Smith*, 5 *Ves.* 189. *Bolmain* v. *Shore*, 9 *Id.* 500. *Rowley* v. *Adams*, 1 *Beav.* 548. *Custance* v. *Bradshaw*, 4 *Hare*, 315.) But I have referred to enough to show it may well be considered *quæstio vexata* in England. Supposing the law laid down by Ld. Thurlow and Sir Wm. Grant to be overruled by the decis-

ions of Ld. Eldon and Sir John Leach, still it seems that, where there is no express agreement, there is but one case in which the real estate is converted, out and out, into personal; that is, where it is purchased with partnership funds, for partnership purposes. (*Perkins' Coll.* § 154.) As between individual and partnership creditors, perhaps it might be different had property in severalty been greatly improved with the partnership funds.

The decisions in this country are as unsatisfactory as in England. Most of them are collected by Mr. Perkins in his edition of Collyer's work on partnerships.

In this state, the question has arisen but a few times. *Coles* v. *Coles* was a case at law, and was decided in 1818. (15 *John.* 159.) There is no doubt but the property descends to the heir, who is tenant in common with the survivors. (*Broom* v. *Broom, supra. Perkins' Colly.* § 133. *Howard* v. *Priest,* 5 *Metc.* 582. *Buchan* v. *Sumner,* 2 *Barb. S. C. Rep.* 165.) But the *dicta* of the court went further, in *Coles* v. *Coles,* than to put the case on mere legal grounds. It was an action of assumpsit by the administratrix of a deceased partner, against the survivor, for a moiety of the avails of real estate conveyed by the partners, and which they had used in their partnership trade. It was contended that it was a partnership transaction, and required the investigation of partnership accounts. But the plaintiff recovered. The court say "the principles and rules of law, applicable to partnerships, and which govern and regulate the disposition of partnership property, do not apply to real estate." And it is added that "there may be special covenants and agreements entered into between partners relative to the use and enjoyment of real estate owned by them jointly, and the land would be considered as held subject to such covenants, but nothing of that kind appears in the present case; and in the absence of such special covenants, the real estate owned by the partners must be considered and treated as such, without any reference to the partnership;" and they rely upon *Thompson* v. *Dixon* and *Bolmain* v. *Shore,* both cases in chancery.

McCoun, V. C., in *Smith* v. *Jackson,* decided in 1833, (2 *Ed. Rep.* 28,) reviewed many of the authorities. Lands, which had

been purchased by partners with partnership funds, and part of which was on speculation, were sold on mortgages given by the partner who had become insolvent, and the struggle was for the surplus money. The court held that it was liable to be applied to partnership purposes, and that the creditors of the firm were entitled to it; subject to an equitable right of dower in favor of the widow of a deceased partner, who had joined her husband in the mortgage. The vice chancellor treated the property as real estate, except that it was liable for the debts of the firm. He notices the English cases of *Thornton* v. *Dixon, Bell* v. *Phyn, Bolmain* v. *Shore,* and *Smith* v. *Smith,* and says it depends upon the agreement of the parties whether the property is to be considered, in equity, real, or converted into personal estate.

In *Delmonico* v. *Guillaume,* (2 *Sandf. Ch. R.* 366, *in* 1845,) Assistant Vice Chancellor Sandford held that real estate, purchased with partnership funds and for partnership purposes, and so used, was liable for the debts of the firm. He declined giving any opinion how it would be between the real and personal representatives.

Chancellor Walworth examined the subject very fully in *Buchan* v. *Sumner,* (2 *Barb. Ch. Rep.* 198 *to* 207.) The rule, as found in *Thornton* v. *Dixon, Bell* v. *Phyn,* and *Bolmain* v. *Shore,* he thought overruled by Lord Eldon in *Townsend* v. *Devaynes;* and that, unless otherwise expressed in the partnership articles, in England, real estate is considered in equity as personal property, and goes to the personal representatives; and cited *Selkirk* v. *Davis,* (2 *Dow's P. C.* 231,) and *Philips* v. *Philips, Broom* v. *Broom, Houghton* v. *Houghton,* and *Morris* v. *Kearsley,* (2 *Young & Coll.* 139,) before Mr. Baron Alderson. He however mentioned the later cases of *Rowley* v. *Adams, Randall* v. *Randall,* and *Baxter* v. *Newman,* (1 *Lutw. Reg. Cas.* 287,) as departures from this rule. But he considers the American decisions as establishing these two principles; that where real estate is purchased with partnership funds, or for the use of the firm, in equity it is chargeable with the debts of the copartnership, and with any balance which may be due from one copartner to another upon winding up the affairs of

the firm. But that, as between the personal representatives and the heir at law of a deceased partner, his share of the surplus of the real estate of the copartnership, which remains after paying the debts of the copartnership, and adjusting all the equitable claims of the different members of the firm as between themselves, is considered and treated as real estate. These cases leave no doubt as to the law in this state; and this is reasonable. It is clear that all depends upon the intention of the parties. And in the absence of any expressed intention to that effect, how can it be presumed that a man intends to convert real estate into personal, and break the descent, merely because a portion of the partnership funds are appropriated for the purchase of real estate? If a member receives a portion of those funds as his dividend, and so appropriates it, clearly no such presumption arises. It is due to the creditors and the members of the firm that the property should not be withdrawn until the partnership affairs are adjusted. But as between heir and executor, the reason of the rule fails. Nor is it clear that the law of England differs so much from that of this state. All the earlier cases, at least, claim to put the conversion upon the intention manifested by the contract or will. And Ld. Eldon, to whom the paternity of the new rule is ascribed, so decided in *Ripley* v. *Waterworth*. The grounds upon which he decided *Townsend* v. *Devaynes*, are at least doubtful; and in *Stewart* v. *Marquis of Bute*, (11 *Ves.* 665, 1804, 6; *S. C.* 3 *Id.* 212,) he said: " In cases where persons engaged in partnership have bought freehold estates, the difficulty of distinguishing and arranging property of different natures, partly personal, partly real, has never, except by the effect of the contract, or the will, been held sufficient against the heir." The case was one on the construction of a will, but related to a colliery carried on by tenants in common in partnership. True in *Salking* v. *Davies*, (2 *Doug*. 242,) he thought all property involved in a partnership concern, ought to be personal; but he appeared to have doubts in the later case of *Crawshay* v. *Maule*, (1 *Swanst.* 508.) The change in the law, if any, is therefore more attributable to Sir John Leach; and recent cases seem returning to the

former rule, which we have adopted. This is, that real estate owned by partners, remains so, unless an equitable adjustment of the concern requires its conversion, or the owner has expressed his intention that it be converted into personalty. (*See Dyer* v. *Clark*, 5 *Metcalf*, 577.)

But it is further contended, that there is an equitable conversion by the will of Townsend McCoun. The death of T. McCoun dissolved the partnership. (*Murray* v. *Mumford*, 6 *Cowen*, 441. *Cary on Partnership*, 162, 185.) A subsequent continuance of a concern may be provided for by will, but the intention should be clearly and distinctly expressed. (*Burwell* v. *Mandeville's Ex'ors*, 2 *How. U. S. R.* 560. *Scholefield* v. *Eicheberger*, 7 *Pet. R.* 586.) On his death his share of the real estate descended to the heir, Mrs. Phebe Buckley, unless affected by the will. And as the devisee in this instance is the heir, she took by descent and not as purchaser, unless a different estate was given her, or there was a conversion. Even if there is a charge upon the realty, (2 *Kent,* 507. *Ram on Wills,* 17,) I do not think there is any conversion. There is in terms no devise of this property to be sold for any purpose, nor a power or direction to sell. There is no clear intention that there should be an absolute conversion. (*Leigh & Dalz. on Eq. Conv.* 88. 2 *Story's Eq. Jur.* § 1213, *a. Bogert* v. *Hertell*, 4 *Hill*, 492.) A general direction to pay debts, it is said, is not a charge upon land for that purpose. (*Lupton* v. *Lupton*, 2 *John. Ch.* 624.) And that is so, it seems, where the executors are directed to pay and no land is devised to them. (*Ram on Assets*, 64, 5. *Keeling* v. *Brown*, 5 *Ves.* 359. *Powell* v. *Robbins*, 7 *Id.* 209. 2 *Story's Eq. Jur.* § 1247. *And see Rogers* v. *Rogers*, 1 *Paige*, 190; *Mollan* v. *Griffith*, 3 *Id.* 402; 2 *Wms. Ex'rs.* 1201.)

The first clause of the will reads, " First. It is my will that all my just debts and funeral expenses be paid by my executors hereinafter named." Upon this, the charge would be confined to property given to the executors. (*Id. And Warren* v. *Davies*, 2 *My. & Keene*, 49. 2 *Jarm. on Wills, by Perkins,* 523. *And see Dover* v. *Gregory*, 10 *Sim.* 393.) And here is

a devise of other lands to the executors, which would be charge-able with debts, unless otherwise specifically and entirely ap-propriated by the will. (2 *Jarm. on Wills*, 525, *and cases there cited.*) I am, however, inclined to think the residuary clause also created a charge upon the remaining lands, if there was a deficiency of personal property. It gives " all the rest and resi-due of my estate and effects, real and personal, not herein other-wise effectually disposed of, (after payment of my debts, legacies, funeral expenses and other charges herein authorized,)" to his daughter. This comes within the rule laid down in *Lupton* v. *Lupton*, (2 *John. Ch. R.* 614. And see *Shallcross* v. *Finden*, 3 *Ves.* 738. 2 *Stor. Eq. Jur.* 1246. *Kidney* v. *Counmaker*, 1 *Ves. jun.* 436, *and note.*) Even if there had been a devise to the executors expressly for the purpose of paying debts, this clause evidently evinces an intention to make the *residuum* also subject to that charge in case of deficiency. (*Graves* v. *Graves*, 8 *Sim.* 43. *Bridgen* v. *Lander*, 3 *Russell,* 345, *n.* *Clif-ford* v. *Lewis*, 6 *Madd. R.* 33. *Withers* v. *Kennedy*, 2 *My. & K.* 607. *Jarm. on Wills, ch.* 45.) In *Douce* v. *Lady Tor-rington*, (2 *M. & K.* 600,) and *Palmer* v. *Graves*, (2 *Keen,* 545,) there was no clause giving the residue after payment of debts. And it would seem there was no real estate not before specified, in *Braithwaite* v. *Britain*, (1 *Keen,* 206,) and *Mi-chouse* v. *Scaife*, (2 *My. & Cr.* 695,) and *Price* v. *North*, (1 *Phillips R.* 85,) are in point. But it is enough in this case that there is no expression which amounts to a conversion out and out ; and, if there is a charge, there has been no sale ; nor is there evidence of any deficiency of personalty to pay debts and legacies. (*Baily* v. *Elkins,* 7 *Ves.* 523. 1 *R. S.* 729, § 56. *Strong* v. *Strong*, 9 *Paige*, 98.)

Again, it is said that the agreement under seal between the partners, in 1825, is a declaration of an intention to consider this property personal. If this, was the purport of that instrument, it may be doubtful whether the covenants would run with the land. However, I think it is not capable of any such construc-tion. There is no evidence that the first lands were purchased by the partners as such, or with copartnership funds ; and the

grist mill, saw mill, &c. though afterwards paid for out of those funds, were conveyed to each one in severalty, by distinct deeds ; and the contract, which followed, so far from stamping that purchase with the character of personalty, expressly declares that any partner may sell all or any part of his interest in the factory or new purchase. The object was to regulate the use of the water so as to prevent litigation. This covenant is not so strong as in *Bolmain* v. *Shore*, already cited, (9 *Ves.* 500 ;) for there the realty was to be used by the partnership during its continuance ; and yet held no conversion, but rather evidence of a contrary intention. Besides, the covenant mostly relates to the new purchase, which was principally property used in business entirely different from that in which the old firm was engaged.

I have now disposed of all the points in the case affecting, that share of the property formerly owned by Townsend McCoun.

The will of John Gale is also in evidence, and his executors, heirs, devisees and widow, are made parties. The first clause is : " 1st. I order and direct my just debts and funeral charges to be paid." He does not order his executors to pay them. This by the English rule, would create a charge upon the realty. (2 *Jarm. on Wills*, 512.) But a charge merely, as we have seen, does not alter the rights of the parties to the realty, until enforced.   (1 *R. S.* 729, § 56.) Nor does a devise of lands in trust to sell and pay debts and legacies, if the devisee can not receive the rents and profits. (*Id. Germond* v. *Jones*, 2 *Hill*, 569.) Though different at common law. (*Hill on Trustees*, 231.) Much less does a mere power to sell. (*Taylor* v. *Morris*, 1 *Comst.* 358, *Jewett, Ch. J.*) And as to the equitable rights of the parties under this will, it is not possible for me to declare them, without knowing the situation of the estate. After the debts are all paid, the widow is to have an annuity of $200 from the " dividends made from the cotton factory, if made to that amount." Without some evidence upon the subject I can not give directions for the distribution of the avails of Mrs. Gale's portion of this property. Nor is it necessary to decide whether

Buckley v. Buckley.

there is a conversion. (2 *Sandf. Ch. R.* 343.) If the property is sold, the proceeds can be disposed of according to the rights of the parties under the will; and a reference, if necessary, may be ordered for the purpose of ascertaining them.

A decree must be entered declaring the copartnership of Wm. Mowry & Co. dissolved; and a reference ordered to take the accounts; the costs of this and of all the proceedings, not relating to partition of the real estate, to be paid out of the property belonging to the present firm, without reference to the real estate. I think good cause for a sale has been shown. The property is so situated and the parties are so numerous, probably a partition is impracticable without great prejudice to the owners. The property to be divided is the real estate owned by the partners at the time of the death of Townsend McCoun, and particularly set forth in the report; and this includes the fixtures and machinery annexed to the freehold, or which are usually thereto attached. The costs of the proceedings for the partition are to be paid out of the proceeds of the sale, and the balance divided as follows: To Wm. H. Mowry and Henry Holmes, each one-twelfth part as the grantees of John T. McCoun the devisee of Samuel McCoun. Unless their wives release, the value of their inchoate right of dower must be ascertained. (*Laws of* 1840, *ch.* 177.) To the widow, executors, legatees, devisees and children of John Gale, deceased, one-third, to be apportioned among them according to their rights, to be ascertained by reference if required. To Anne Caroline Holmes, wife of Henry Holmes, one-sixth, as devisee of Wm. Mowry, deducting the value of the interest of her husband. Whether there is issue of this marriage, is not in proof. He will take for their joint lives, or as tenant by the curtesy initiate, as that may be.

Of the remaining third, the plaintiff is entitled to the value of an estate for the life of Phinehas H. Buckley therein. Also absolutely, to a reasonable proportion of the avails, as owner of one-third of the buildings and fixtures, and improvements made, built or purchased for the purposes of trade or manufacture, since the death of Townsend McCoun. But this does not in-

clude erections, fixtures, &c. repaired merely and not originally made, erected, or entirely rebuilt, or purchased since his death. The remainder of the avails of this one-third belongs to the children of Mrs. Buckley ; the share of Mrs. Rutherford being subject to any interest to which her husband is entitled.

[St. Lawrence Special Term, October 21, 1850. *Hand,* Justice.]